(93 Misc. Rep. 227)

POWELL et al. v. CITY OF ROCHESTER. PEDRO et al. v. SAME.
COHEN v. SAME.

(Supreme Court, Equity Term, Monroe County. September 1, 1915.)

1. NUISANCE ☞61—WHAT CONSTITUTES.

A building or obstruction within the channel of a river, which, in times of high water, causes it to overflow and inundate surrounding property, is a nuisance, both as to the city and persons injured.

[Ed. Note.—For other cases, see Nuisance, Cent. Dig. §§ 142–151; Dec. Dig. ☞61.

For other definitions, see Words and Phrases, First and Second Series, Nuisance.]

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

2. NAVIGABLE WATERS ☜2—AUTHORITY—RESERVATION OF RIGHT BY THE STATE.

Where the state of New York, by the treaty of cession between New York and Massachusetts, in 1786, granted to Massachusetts the actual ownership of the land which included the bed of the Genesee river, but reserved to itself all right and title to government, sovereignty, and jurisdiction, the reservation gave to the state of New York the right to regulate the river and to declare and maintain it a public highway.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 2, 63; Dec. Dig. ☜2.]

3. NAVIGABLE WATERS ☜1—NAVIGABLE STREAM—DECLARATION.

Where a river has been declared a navigable stream, the fact that navigation considerably diminishes does not deprive it of the character of a navigable stream.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 5–16; Dec. Dig. ☜1.]

4. NAVIGABLE WATERS ☜25—OBSTRUCTIONS—RIGHTS OF RIPARIAN OWNER.

Where the state, under its power of sovereignty, had declared a river to be a navigable stream, a riparian proprietor, though he owned to the thread of the river, cannot place obstructions in the channel which cause overflows in times of high water, to the detriment of other owners and a city, for such obstructions would constitute a nuisance, and, though the river was not much used for navigation, would be inconsistent with the character of the stream as a navigable one.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. § 65; Dec. Dig. ☜25.]

5. NAVIGABLE WATERS ☜3—OBSTRUCTIONS—REMOVAL.

As the Genesee river had been previously declared navigable, and was navigable, Laws 1907, c. 755, §§ 111, 256, 258, authorizing the city of Rochester to remove obstruction which caused overflows, and to deepen the channel, is valid; the Legislature having authority over the stream.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 3, 10; Dec. Dig. ☜3.]

6. NAVIGABLE WATERS ☜7—REMOVAL OF OBSTRUCTIONS—POLICE POWER.

Independently of statute, a city may, under its police power, deepen the channel of a navigable stream within its limits, and remove obstructions which, in high water, cause overflows.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. § 18; Dec. Dig. ☜7.]

7. COURTS ☜100—PRECEDENCE—SUBSEQUENT DECISIONS.

The last decision of the court upon a matter is controlling.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 341–343; Dec. Dig. ☜100.]

8. NAVIGABLE WATERS ☜44—DEEDS—CONSTRUCTION—INTEREST GRANTED.

Where land conveyed by the acre was bounded by an object on the west bank of a river, which was made the east boundary of the land, a subsequent change in the river bank did not entitle the grantee to any land which might be added, for the original bank marked the boundary of the grant.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 266–278, 281, 282; Dec. Dig. ☜44.]

9. NAVIGABLE WATERS ☜25—DEEDS—CONSTRUCTION—RESTRICTIONS.

Where a city owned land abutting on a stream, which it held under the implied restriction that the flow of the stream should not be retarded, its conveyance of such land, though carrying title to the center, will not entitle the grantees to place obstructions in the stream, causing an overflow.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. § 65; Dec. Dig. ☜25.]

☜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Actions by William D. Powell and another, by Antonio Pedro and another, and by Hyman J. Cohen against the City of Rochester. Judgment directed for defendant in each action.

Raymond H. Arnot, of Rochester, for plaintiffs Powell and Miller.

Frederick M. Whitney and P. Chamberlain, both of Rochester, for plaintiff Pedro and another.

Norman Rosenberg, of Rochester, for plaintiff Cohen.

William W. Webb and Benj. B. Cunningham, both of Rochester, for defendant.

SAWYER, J. These three actions were tried together and the facts are substantially the same, except that the plaintiffs Powell and Miller hold under a deed from the city of Rochester. The Genesee river, one of the largest rivers of the state, flows northward through the city and on until it finds an outlet in the waters of Lake Ontario. Front street (or Mason street, as it was then called), when originally laid out, from about opposite its intersection with Corinthian street southerly, increasingly extended into the river until at its junction with what is now Main street it was almost entirely within the river bed. From time to time efforts were made to reclaim the street, and for that purpose various walls were built to restrain the westerly spread of the waters and enable a fill to be made in their place. The history of this part of Front street is exceedingly interesting, and the evidence of these repeated efforts to utilize a portion of this river for the benefit of mankind has thrown much light upon the present controversy, although we are here directly concerned with but three of the walls in question, and with one of these only so far as it enters into the title of the premises owned by plaintiffs Powell and Miller.

In July, 1837, the common council of the city adopted an ordinance providing for the erection of a wall which should be 66 feet east from the westerly line of Front street as in such ordinance established, and that that part of Front street embraced within those limits should be improved as a street. The ordinance also reserves to the city the right at any time thereafter to improve and occupy all or any part of said street lying east of the proposed wall, as same was originally laid out. This wall is known as the wall of 1837, and is now the east line of Front street as used. Some time prior to 1837 one C. H. Carroll had erected a wall still further to the east, now known as the Carroll wall, and which, at that point, is the present west bank of the river. As the Carroll wall approaches Main street it angles westerly, and defendants now claim that the wall of 1837 was only extended northerly far enough to meet the end of this angle. A careful examination of the maps, ordinance, and other evidence seems, however, to demonstrate that this wall of 1837 was continued to the point where the east line of Front street intersected with the west bank of the river. Both of these walls, as well as those erected by Mastick and by Works and Graves, were built in the bed of the river.

That portion of the river lying west of the Carroll wall has now been entirely reclaimed, and the separate properties of the plaintiffs Pedro and Cohen stand thereon, beginning at the wall of 1837 and

running easterly until they meet and rest upon the Carroll wall, beyond which their buildings extend; the Pedro building 7½ feet, with a balcony of about 3 feet in addition, and the Cohen building a little over 13 feet, with a similar balcony about 4 feet further. As above stated, the Carroll wall, with a continuation thereof from its angle corner southerly to Main street, constitutes the present west bank of the river, and consequently these projections of the Pedro and Cohen buildings beyond it are in the river channel. Prior to 1854, the city of Rochester had acquired title to a strip of land bounded on the west side of the wall on Mason street (the Mastick wall), on the south by the north line of Buffalo street (now Main street) extended towards the center of the Genesee river, the lot to be 40 feet wide measured on the wall on Mason street and to extend 60 feet eastwardly of that width towards the center of Genesee river from said wall, also the right to rest the timbers of the market house then thereon, or any other building to be erected by them, on the pier on which the east end of the market then rested to the center of said pier, but not to use any part of the premises beyond the said 60 feet for any other object, together with the right of replacing and repairing the timbers from time to time when necessary. July 1, 1854, the city conveyed all that part of these premises lying east of the east line of Front street, which was then the wall of 1837 and the bridge abutment of which the wall was a continuation, together with the same rights of use of the piers, etc., to one Aaron Erickson, through whom title to these premises has now become vested in the plaintiffs Powell and Miller.

[1] In about the year 1858 or 1859 the old market house was replaced by the building now thereon standing. The market house, so called, had largely stood above the then channel of the river; but it was without basement, and no part of it extended down so as to obstruct the flow of the water. The present building, however, has a suspended basement about 8 feet 9 inches in depth, most of which is over the river. The Genesee river is subject to freshets of yearly occurrence, which at times overflow its banks, inundate the streets of defendant in its vicinity, and especially Front street, clog its sewers, so that same back into many buildings, and altogether cause great inconvenience and property loss to the city and its citizens. The buildings of all these plaintiffs extend into the river channel, and, while above low-water level, in such times of freshet are a serious obstruction to the free flow of the waters, and constitute a nuisance to the city and its inhabitants. City of Rochester v. Erickson, 46 Barb. 92.

After much study and investigation had by recognized experts the authorities of the city, for the purpose of remedying this situation and for the protection of its people and their property, have decided to lower the present bed of the river 5 or 6 feet, beginning at the brink of the Upper Falls and extending to a point south of the Erie Canal aqueduct, and to raise the Carroll wall so that same shall be on an average about 3 feet higher than the crest of the flood of 1913, at the same time closing all openings now in the wall, and, so far as possible, rendering same impervious to the water. The wall as so raised will extend between 3 and 4 feet above the street floor into the rear

part of the premises owned by the plaintiff Pedro and the plaintiff Cohen, and nearly 5 feet above the floor of the basement of the premises of the plaintiffs Powell and Miller. This will deprive such basement of any usefulness and injure somewhat the value of the store of the other plaintiffs. In these actions a permanent injunction restraining the city from carrying on the work as contemplated is sought.

[2-4] It is insisted by the plaintiffs Pedro and Cohen that they are the owners of the land to the center of the river as it now is, and by the plaintiffs Powell and Miller that they are owners in fee of the land in the river under their building as now constructed. Whether these claims are well founded, or otherwise, is of minor importance. Whatever title to the land in the river they may have is at all times subject to the natural flow of the waters. No citation of authority is needed for the proposition that a man is not permitted to so use his own property as to constitute it a nuisance to his neighbors, and any obstruction of this river bed by its owners which interferes with the rights, comfort and well-being of the city and its inhabitants can be prevented. Hodges v. Perrine, 24 Hun, 519.

While by the treaty of cession, made between New York and Massachusetts in 1786, New York granted to Massachusetts the actual ownership of the land which included the bed of the Genesee river, it nevertheless reserved unto itself "all right and title to government, sovereignty, and jurisdiction." This reservation carries with it the right of regulation of the river for all purposes of general public use, and includes the right to declare and maintain same as a public highway, with its consequent disability to riparian owners. Smith v. Rochester, 92 N. Y. 464, 467, 44 Am. Rep. 393. By an enactment passed August 10, 1798, the Legislature accordingly declared the Genesee river to be a public highway. The rapids and falls, from somewhere near the present Court street dam to beyond the Lower Falls, were then, as now, a bar to actual navigation between those points; but that it was then navigable below the Lower Falls and from above the rapids for many miles is a matter of history, and that such navigability still continues to some extent is not seriously disputed, although probably the usefulness of the river for such purposes has decreased as the years have gone by. It might be a nice question to determine when a stream which by legislative enactment is made a public highway ceases to be such, but that question is not here. So long as it is used to any extent, its statutory character is not lost, and the fact that certain parts of it were never navigable does not alter its character as a navigable stream and public highway. United States v. Montello, 20 Wall. 430, 22 L. Ed. 391; St. Anthony Falls, etc., v. Board of Water Co., 168 U. S. 349, 18 Sup. Ct. 157, 42 L. Ed. 497. The state having thus, in the exercise of its reserved powers under the treaty, recognized the navigability of this river, it becomes immaterial whether title to its bed is in the owners of the adjoining lands or otherwise, although there might be some uncertainty upon that subject. Buffalo P. L. v. L. E. & W., 10 A. N. C. 107; Smith v. Rochester, supra.

[5] By the act declaring the Genesee river to be a public highway the state also forbade the placing of obstructions therein. In addition it has, as it lawfully might, since conferred upon defendant full authority to deepen same, and for the construction, alteration, and repair of its banks and their walls, and other improvements as defendants may deem necessary. Laws 1907, c. 755, § 111. Defendant has also been empowered by it to remove any encroachments, obstructions, or structures unlawfully maintained *over* or under a public street, *highway,* or place, and without reference to the lapse of time which it had existed. Id. §§ 256–258. The Legislature had the control of the river, and by that broad language it intended to transfer to that extent that control to defendant seems to admit of no doubt. The city is attempting under those conferred powers to construct in the channel of the river a wall so as to confine the waters of the river within the channel. "The very purpose of the channel is to carry the waters flowing therein, and no one can complain because the city is attempting to make a construction so that the river will fulfill its purpose." Nor ought one to be heard to complain because in so doing the city finds it necessary to interfere with or even remove obstructions to the water's flow.

[6] Even without the legislation so contained in its charter, the city under the police power has the right to build a wall in order to protect private and public property from damage and destruction by flood. In the discussion of the case of Mugler v. Kansas, 123 U. S. 633, 8 Sup. Ct. 273, 31 L. Ed. 205, an act under the prohibition law to declare a brewery to be a common nuisance, the court in discussing the police power said:

"The principle that no person shall be deprived of life, liberty, or property, without due process of law was embodied in substance in the Constitutions of nearly all, if not all, of the states at the time of the adoption of the Fourteenth Amendment; and it has never been regarded as incompatible with the principle, equally vital, because essential to the peace and safety of society, that all property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the community. * * * The power which the states have of prohibiting such use by individuals of their property as will be prejudicial to the health, the morals, or the safety of the public, is not—and, consistently with the existence and safety of organized society, cannot be—burdened with the condition that the state must compensate such individual owners for pecuniary losses that they may sustain, by reason of their not being permitted, by a noxious use of their property to inflict injury upon the community. The exercise of the police power by the destruction of property which is itself a public nuisance, or the prohibition of its use in a particular way, whereby its value becomes depreciated, is very different from taking property for public use, or from depriving a person of his property without due process of law. In the one case a nuisance only is abated; in the other, unoffending property is taken away from an innocent owner."

And the doctrine there enunciated has been constantly held in this state. People v. Carbonic Acid Gas Co., 196 N. Y. 421, 90 N. E. 441; Rochester v. McCauley, 199 N. Y. 207, 92 N. E. 641, 32 L. R. A. (N. S.) 554; People ex rel., etc., v. Squire, 107 N. Y. 593, 14 N. E. 820, 1 Am. St. Rep. 893, affirmed 145 U. S. 175, 12 Sup. Ct. 880, 36 L. Ed. 666; Health Dep. v. Rector, 145 N. Y. 32, 39 N. E. 833, 27 L. R. A.

710, 45 Am. St. Rep. 579; New York v. Herdje, 68 App. Div. 370, 74 N. Y. Supp. 104. The situation showing the application of these decisions, and the right of the city under the police power to carry out its project of raising this wall and render it water tight, is admirably summed up in the brief of counsel for the city in the following language:

"The city of Rochester is not interfering with the existing buildings of plaintiffs, except so far as they project over the channel of the river. It is not in this action attacking the rights of the several plaintiffs to occupy the land to the wall which is being constructed and raised by the city. It is merely seeking to have the plaintiffs use that land and maintain their buildings thereon in such a manner that the rights of the adjoining property owners and of the public generally will not be interfered with. If the several buildings of the respective plaintiffs are maintained in their present condition, streets and cellars will be flooded, and damage will be done to public and private property, and the public health will be endangered by the filth and refuse left by the receding waters. The city now seeks to make the plaintiffs use the land occupied by them in such a manner as not to cause damage to other property or endanger the public health."

It must not be overlooked in this connection that the reservation in the ordinances of 1837 of the right at any time thereafter to improve or occupy all or any part of the street lying easterly of the wall therein proposed operates as a restriction upon the title of the plaintiffs Pedro and Cohen, at least, and emphasizes the justice of defendant's position.

The discussion has proceeded thus far upon the theory that, subject to the flow of the water and the right of the public to use the river for navigation, the claim of these plaintiffs to ownership of the lands in the bed of the river is well founded, or at any rate immaterial. I am persuaded, however, that ownership of the river bed, as it now is, is not in them.

[7, 8] By the treaty of cession above spoken of the title to all these lands, including those lying in the channel of the river, became vested in the state of Massachusetts, from which they subsequently passed to Phelps and Gorham. Whatever record rights those plaintiffs have in the premises are held through a chain of title from the deed of the 100-acre tract by Phelps and Gorham to Ebenezer Allen. That deed is not in evidence, but is referred to in that from Phelps and· Gorham to Ebenezer Hunt et al., and it was long ago definitely held, in an action where the question was squarely presented, that the deed to Allen conveyed only to the bank of the river and included none of the river bed. Starr v. Child, 5 Denio, 599. That case has never, so far as I have been able to ascertain, been reversed or in any manner modified, and a reference to the opinion of Lott, Senator, found upon page 609, will show that there, as here, the Allen deed was not in evidence, but that its contents were made known, its construction had, and the determination made from the recitals contained in that from Phelps and Gorham to Hunt, here introduced.

Counsel for plaintiff have called attention to the decision in Commissioner v. Kempshall, 26 Wend. 404; but inasmuch as the Starr Case was decided in 1846, five years later, it must be held, as the latest expression of the court upon the subject, to be conclusive of the question. A comparison of the two cases shows also that in the first the deeds were not before the court, and the determination was based upon the

presumption under the general rule of the common law; whereas the Starr decision was founded upon a construction of the conveyance title. If, therefore, the plaintiffs Pedro and Cohen hold their titles under the Allen deed, they took nothing lying in the bed of the river, and their easterly line is the west bank thereof. It should not be forgotten, however, that the deed from Phelps and Gorham to Ebenezer Allen was made about the 8th day of November, 1790, and conveyed 100 acres of land to be laid out in a square form as near as the traverse of the river would admit, the said Allen mills to be the center of the eastern boundary. The west bank of the river then, and for many years thereafter, was west of the lands now occupied by these plaintiffs and covered a goodly portion of Front street. It follows that the traverse of the river, spoken of in the Allen deed, was not the west bank of the river as it now stands, but as it then was, and that title east of the then west line of the river is still in Phelps and Gorham, or their successors in interest. The tablet on the east side of the Powers building, if correctly placed, would indicate that the then west bank of the river was beyond Front street, for the deed recites the mill to be the center of the eastern boundary.

If, as claimed by these plaintiffs, their title comes under the deed from Ebenezer Allen to Benjamin Barton, Mr. Allen assumed to convey lands which in Starr v. Child it is held never belonged to him. This title is, of course, good as against any one except possibly the descendants or grantees of Phelps and Gorham; but what is practically a "squatter's title" will not be extended beyond the bounds actually occupied, and certainly will not be deemed to reach into the bed of a river absolute ownership of which is not in the state, but by unimpeached deed in other persons.

[9] As to the Erickson property, the city is, by its deed to Mr. Erickson, estopped from denying the title of plaintiffs Powell and Miller to such part thereof as lies within the bed of the river, whatever may be the rights in that respect of the descendants of grantees of Phelps and Gorham. This deed, however, must be construed in the light of the nature of the property and of its phraseology. While it assumes to convey some portion of the bed of the stream, it was necessarily conveyed subject to the natural flow of the waters over it at all times. The city took it subject to that implied restriction, and could not lawfully convey it away in any other manner. The provision that the timbers of the building then or thereafter to be erected upon the premises should be permitted to rest upon the pier in the river refers to foundation timbers, and indicates unmistakably the understanding and intention of the parties that, while buildings above that level could be erected and maintained, no structure below that level was to be had.

It has been specifically held that foundations for structures on that corner could not be built in the stream. City of Rochester v. Erickson, supra. And the reasoning of the court is equally applicable to structures hanging from the building, which are barred by the terms of the deed itself, as well as because of their nuisance. For these reasons I have reached the conclusion that the work upon which defend-

ant is engaged interferes with no lawful right of any of these plaintiffs, and cannot be enjoined.

Judgment in favor of defendant in each action is directed, with costs.