# PEOPLE OF THE STATE OF NEW YORK *ex rel.* NEW YORK ELECTRIC LINES COMPANY *v.* SQUIRE.

ERROR TO THE COURT OF COMMON PLEAS OF THE CITY AND COUNTY OF NEW YORK.

No. 185. Argued March 3, 4, 1892. — Decided May 2, 1892.

The statute of June 13, 1885, of the State of New York (Sess. Laws 1885, c. 499) requiring companies operating or intending to operate electrical conductors in any city in the State to file with the Board of Commissioners of Electrical Subways maps and plans before constructing the conduits, and the statute of that State of May 29, 1886, (Sess. Laws 1886, c. 503) assessing the salaries and expenses of such board upon the several companies operating electrical conductors in any city in the State, are a constitutional exercise of the general police powers of the State, and are applicable to the New York Electric Lines Company which, before the passage of either of said acts, was incorporated under the laws of New York, and had obtained from the municipal government of the city of New York permission to lay its conductors in and through the streets and highways of the city, and had filed a map, diagram, and tabular statement indicating the amount, position and localities of the spaces it proposed to occupy in and under the streets.

The said law of 1885 simply transferred the reserved police power of the State from one set of functionaries to another and required the company to submit its plans and specifications to the latter, who would determine whether they were in accordance with the terms of the ordinances giving it the right to enter and dig up the streets of the city; and, being so construed, it violates no contract rights of the company which might grow out of the permission granted by the municipality.

The said act of 1886 comes within the principles settled in *Charlotte &c. Railroad v. Gibbes*, 142 U. S. 386, and is not in conflict with the provision in the Fourteenth Amendment that no State shall deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws.

The court stated the case as follows:

This was an application for a writ of mandamus on behalf of the New York Electric Lines Company, a New York corporation, to compel the commissioner of public works of New York City to give it written permission to make excavations and

open up the streets and pavements of the city for the purpose of laying its wires and other conductors of electricity underground, and of making its underground electrical connections, in accordance, it was claimed, with its franchise for such purposes, theretofore obtained from the city.

The application was presented to the Court of Common Pleas for the city and county of New York, at a special term, and was denied, on the ground that the relator had not obtained the approval of the commissioners of electrical subways for that city and county, of the plans and specifications proposed by it for the construction of its underground electrical system. Upon appeal to the court in general term the order denying the application was affirmed, (14 Daly, 154, 166,) and the relator thereupon appealed to the Court of Appeals of the State, which affirmed the judgment below. 107 N. Y. 593. The record having been remitted to the Court of Common Pleas, and the judgment of the Court of Appeals having been there entered, as its judgment, this writ of error was sued out.

The case as presented by the petition for mandamus and its accompanying exhibits is substantially this: The relator was incorporated on the 14th of October, 1882, under the general telegraph law of April 12, 1848, (Laws of 1848, c. 265,) and the various acts amendatory thereof and supplementary thereto, "for the purpose," as stated in its certificate of incorporation, " of owning, constructing, using, maintaining and leasing lines of telegraph wires or other electric conductors for telegraphic and telephonic communication, and for electric illumination, to be placed under the pavements of the streets, avenues, and public highways of the cities of New York and Brooklyn in the State of New York, and under the sidewalks of the streets and avenues of the said cities, and upon, over or under private lands in the said cities, within blocks of buildings erected or to be erected therein, and for the purpose of owning franchises for laying and operating the said lines of electric conductors, and the purchasing, owning and disposing of such real estate within the said cities, and such personal property as may from time to time be necessary and

convenient to the building, using, maintaining and leasing the said lines of electric conductors."

By section 5 of the original act of 1848, telegraph companies were authorized to construct their lines "along and upon any of the public roads and highways, or across any of the waters within the limits of the State," "*provided the same shall not be so constructed as to incommode the public use of said roads or highways, or injuriously interrupt the navigation of said waters.*"

By § 2 of the amendatory act of June 29, 1853, Laws 1853, c. 471, the privilege was extended to such companies of erecting or constructing their lines "upon, over or under any of the public roads, streets and highways, and through, across, or under any of the waters," of the State, subject to the same restrictions contained in the act of 1848.

By § 1 of the act of June 10, 1881, Laws 1881, c. 483, amendatory of the preceding acts on this subject, it was provided as follows: "1. Any company or companies organized and incorporated under the laws of this State for the purpose of owning, constructing, using and maintaining a line or lines of electric telegraph within this State, or partly within and partly beyond the limits of this State, are hereby authorized, from time to time, to construct and lay lines of electrical conductors *underground* in any city, village, or town within the limits of this State, *subject to all the provisions of law in reference to such companies not inconsistent with this act: provided,* that such company shall, before laying any such line in any city, village or town of this State, first obtain from the common council of cities, the trustees of villages, or the commissioners of highways of towns *permission* to use the streets within such city, village or town for the purposes herein set forth."

The foregoing embraces the material parts of the statute law of New York relating to telegraph companies, in force when the relator was organized.

Within a few months after the relator was incorporated, to wit, April 10, 1883, the board of aldermen of the city of New York adopted resolutions giving to the relator permission to

lay its wires underground through the city, in accordance
with certain restrictions and upon conditions particularly
specified.   The material portions of these resolutions were as
follows :

"*Resolved*, That permission be and hereby is granted to the
New York Electric Lines Company to lay wires or other con-
ductors of electricity in and through the streets, avenues and
highways of New York City, and to make connections of such
wires or conductors underground by means of the necessary
vaults, test-boxes and distributing conduits, and thence above
ground, with points of electric illumination or of telegraphic or
telephonic signal, in accordance with the provisions of an ' ordi-
nance to regulate the laying of subterranean telegraph wires
and electric conductors in the streets of the city,' passed by
the common council and approved by the mayor, December
14, 1878 ; *provided*, however, and it is hereby ordained and .

"*Resolved*, That whenever the said New York Electric Lines
Company, in the progress of laying its lines of electric conduc-
tors, shall be prevented or obstructed from placing its wires
in the spaces which may have been generally selected under
the ordinance, passed and approved as aforesaid, by manholes
of *sewer, gas, steam or water mains*; or other underground or
pavement impediments, now and heretofore existing, then,
and in such cases, the said company may, under the privileges
hereby granted, vary the space selected, by adopting, appro-
priating and using equivalent and nearest practicable spaces
as may be found necessary ; and *provided further*, and it is
hereby further

"*Resolved and ordained*; That the connection vaults or
test-boxes aforementioned, may be extended underground not
more than four feet in depth or two feet in any lateral direc-
tion beyond the limited spaces contemplated for the lines of
wires, in the ordinance passed and approved as aforesaid and
may be fitted with covers, or other means of access, at the
level of the pavements of the several streets and avenues."

Then follow several paragraphs of the ordinance relating
to the compensation to be paid by the relator for the franchise
thus given to it.

The ordinance of December 14, 1878, referred to in the first paragraph of that of 1883, as regulating the conditions and limitations upon which the franchise was granted, was as follows:

"No telegraph line or electric conductor shall be laid under the streets of this city at such depth from the surface that the necessary excavation incident to laying or repairing the same shall expose or endanger any water or gas pipes, sewers, or drains, or any parts thereof.

"Such wires or conductors shall in no case be placed at a greater distance from the curbstone separating sidewalks from carriage-way than four feet, except in crossing streets running transverse to the direction of said lines, when such crossing shall be made in the shortest straight line or in making necessary connections with buildings and stations.

"The method employed in laying said conductors shall be such that it will at no time be necessary to remove so much of the pavement, or to make such excavation as to *materially impede traffic or passage upon sidewalks or streets during operation of laying or repairing said conductors*, except when in crossing streets transversely, where it shall be permitted to remove the paving stone for a width not exceeding two feet, and in the nearest straight line from corner to corner. In no case during the general hours of passage and traffic shall passage be interrupted thereby for a longer period than one hour.

"The work of removal and replacement of the pavements in any and all of the streets, avenues, highways and public places in and through which the wires of any telegraph company shall be laid shall be subject to the control and supervision of the commissioner of public works. Excavations in any and all of the unopened streets, avenues, highways or public places shall also be subject to like control and supervision.

"The space selected for placing said wires, in every case being limited as to direction and general position by the foregoing provisions, shall not exceed two feet in width by two feet in depth.

"Grantees under this ordinance shall be required within six

months after such permission shall be granted to file with the county clerk maps, diagrams, and tabular statements, including the amount and position of the spaces proposed to be occupied by them, and their rights and privileges under this ordinance shall be confined to the spaces, positions, and localities as indicated by said maps, diagrams and statements."

On the 16th of April, 1883, the relator accepted the franchises granted to it by the resolutions of the 10th of that month, and on the 18th of May of the same year, it filed in the office of the clerk of the county of New York a map, diagram and tabular statement, indicating the amount and position and localities of the spaces it proposed to occupy in and under the streets and other land in the city and county of New York. The petition avers that the relator immediately thereafter proceeded to make ready its material and plant for the construction of its electrical conductors and underground lines in the city, and began to develop and elaborate its mechanical constructions for the same, and to make ready the machinery, appliances and implements for its works, in pursuance of the objects of its incorporation, and at great expense; that since then it had purchased and partly paid for and become obligated to pay the sum of $50,000 and upwards for property essential to the execution of its rights, under the aforesaid laws and ordinances; and that more than 3000 shares of its capital stock, of the par value of $100, had been issued by it and sold to persons who had relied upon its said franchise.

It seems, however, that notwithstanding the acts done by the relator, as above averred, it took no steps towards opening up the streets and avenues of the city for the purpose of laying its wires and other electrical connections underground, until on or about July 21, 1886, when it made an application to the commissioner of public works for a permit to be allowed to make the necessary excavations, etc., for such purpose, which application was denied by the commissioner on the 23d of the following month. This denial, as already stated, was made because the relator had not obtained the approval of the Board of Commissioners of Electrical Subways, created by the act of

the New York legislature, approved June 13, 1885, Laws 1885, c. 499, of the plans and construction proposed by the relator.

As this act of the legislature has a very important bearing upon the material questions in this case, it will be necessary to refer more particularly to it. Its first section authorized and directed the mayor, comptroller and commissioner of public works of cities having more than one million population to appoint three disinterested persons, residents of the city for which they should be appointed, to be a Board of Commissioners of Electrical Subways. By its second section it was made the duty of such board to cause all electrical wires and other conductors of electricity to be removed from the surface and placed underground wherever practicable, and to require all electrical companies operating or intending to operate electrical conductors in any street, avenue or highway of the city to transact their business by means of underground conductors wherever practicable. Its third section provided as follows:

"Sec. 3. When any company, operating or intending to operate, electrical conductors in any such city shall desire or be required to place its conductors, or any of them, underground in any of the streets, avenues or other highway of any such city, and for that purpose to remove the same from the surface thereof, and shall have been duly authorized to do so, it shall be obligatory upon such company to file with said board of commissioners a map or maps, made to scale, showing the streets or avenues or other highways which are desired to be used for such purpose, and giving the general location, dimensions and course of the underground conduits desired to be constructed. Before any such conduits shall be constructed it shall be necessary to obtain the approval by said board of said plan of construction so proposed by such company; and said board has and shall have power to require that the work of removal and of constructing every such system of underground conductors shall be done according to such plan so approved, subject at all times to such modifications as shall from time to time by the board be made, and subject also to the rules and regulations, not inconsistent herewith, prescribed

or to be prescribed by the local authorities having control of such streets, avenues or other highways of such city."

Various other duties were devolved upon this board by the subsequent sections of the act, but they need not be referred to in this connection. This act of 1885 was amended in certain particulars, also not material to the questions involved in this case, by the act of May 29, 1886, Laws 1886, c. 503. The only other section of the statute necessary to be mentioned is section 7 which, as amended, is as follows:

"The amount of such salaries and expenses [of the board of subway commissioners] shall, in such proportion as is prescribed in section eight of this act, be by the comptroller assessed upon and collected from the several companies operating electrical conductors in any such city of the State which, under the provisions of this act, are or shall be required to place and operate any of their conductors underground, and shall be paid into the treasury of the State, in such instalments as the comptroller shall require."

After the refusal of the commissioner of public works to issue the permit above mentioned, the relator applied to the Common Pleas Court for a peremptory mandamus to compel him to issue it, with the result as stated in the opening paragraphs of this statement.

*Mr. E. M. Marble* for plaintiff in error.

I. The court erred in holding that the acts of the legislature of the State of New York of 1885 and 1886, were applicable to the relator's contract and franchise, made with and obtained from the city of New York, through its proper officers.

(*a*) Statutes will be construed in accordance with the purpose for which they were passed. The purpose for which the act of June 13, 1885, was passed, was to convert existing overhead systems of electrical wires and cables into underground systems, and this purpose is expressly so declared. Clearer and more explicit language than is used in these acts to express the purpose for which they were passed can hardly be conceived.

There is no provision in either of them which provides for any action or supervision by the board of commissioners in connection with such a system as the relator obtained a franchise to construct under the streets, avenues and highways of the city of New York. On the contrary, as will be seen by reference to the second section of the act of 1885, it is made the duty of the board of commissioners " to cause to be removed from the surface and put, maintained and operated underground, whenever practicable, all electrical wires or cables used or to be used in the business of any such company." Wherever a reference is made to "such company," it is a company which shall be required to remove its electrical conductors from the surface underground.

 Nothing can be plainer from the language of the several sections of this act than that the intent of the legislature in passing said act was simply, and only, to compel existing companies to convert their overhead systems into underground systems; and such being the case, we submit that the act should be construed according to its purpose, and not to include more than the legislature intended. *United States* v. *Saunders*, 22 Wall. 492; *Platt* v. *Union Pacific Railroad*, 99 U. S. 48; *James* v. *Milwaukee*, 16 Wall. 159.

(*b*) Statutes will not be construed to act retroactively unless their language imperatively requires such construction. The contract between the city of New York and the relator was made April 16, 1883, when the relator accepted the franchise granted it by the mayor and aldermen of the city of New York, upon the terms and conditions mentioned therein, and it was fully completed and perfected by the filing of a map, diagram and tabular statement indicating the amount, position and localities of the spaces to be occupied in and under the streets and other lands in the city and county of New York, on May 18, 1883.

The franchise thus granted to the relator was not based simply on the agreement to comply with the ordinances and regulations which had been or might be passed by the Common Council of said city, but had a    ell a money considera-
'tion, which was to be paid by the relator into the treasury

of said city, and then the city had the option, either to accept the two wires for the use of the police, and for the fire-alarm telegraph, as a donation, or in lieu thereof a money consideration of two per cent on the gross receipts of said company In other words, the franchise granted to the relator was granted in part, if not wholly, upon a money consideration to be paid to said city. A franchise obtained in this manner is lawful, under the constitution and laws of the State of New York. *People* v. *O'Brien*, 111 N. Y. 1, 30, 31.

Having thus acquired by its franchise a right of property in the streets of said city, and thereafter having prosecuted its work faithfully to carry out and fufil the undertaking upon which it had entered, we submit that the acts of 1885 and 1886 referred to, cannot be held to apply to the franchise and contract of the relator, unless it be held that said acts must be construed to operate retroactively.

In *Chew Heong* v. *United States*, 112 U. S. 536, this court, through Mr. Justice Harlan, said: "We have stated the main reasons which in our opinion forbid that interpretation of the act of Congress. To these may be added the further one, that the courts uniformly refuse to give to statutes a retrospective operation, whereby rights previously vested are injuriously affected, unless compelled to do so by language so clear and positive as to leave no room to doubt that such was the intention of the legislature."

II. The court erred in holding that the acts of the legislature of the State of New York of 1885 and 1886, did not impair the contract made between the city of New York and the relator, if said acts are applicable thereto.

It has uniformly been held by this court that the words "there be and hereby is granted" import a grant *in presenti*. *Railroad Co.* v. *Smith*, 9 Wall. 95; *Schulenberg* v. *Harriman*, 21 Wall. 48, 60; *Leavenworth & Lawrence Railroad* v. *United States*, 92 U. S. 733.

We submit that the words "that permission be and hereby is granted," occurring in the first clause of the relator's franchise, are words of like import and should be construed and held to have the same force as where grants are made of the entire title to lands.

So far as we know, the decisions of this court are uniform in holding that where a grantee or a beneficiary under a grant, has complied with the condition of said grant by filing a map locating its grant and determining its limits, boundaries and quantity, from that moment the grant attaches, and unless there are conditions subsequent, the right of the grantee or beneficiary is complete to the lands granted.

Abolishing an existing remedy for the enforcement of a contract, without substituting an equivalent remedy therefor, impairs the contract.

The contract between the city of New York and the relator is valid and of the kind and character protected by the Constitution of the United States from impairment by state legislatures. *People* v. *O'Brien*, 111 N. Y. 1, 30, 31; *People* v. *Sturtevant*, 9 N. Y. 263; *S. C.* 59 Am. Dec. 536; *Milhau* v. *Sharp*, 27 N. Y. 611; *S. C.* 84 Am. Dec. 314; *Brooklyn Central Railroad* v. *Brooklyn City Railroad Co.*, 32 Barb. 358, 364.

At the time the relator made its contract with the city of New York the writ of mandamus was a right to which the relator was entitled, to compel the defendant, if he refused, to give it a written permit to open the streets, in accordance with its map, diagram and tabular statement, whenever the relator should be ready to commence active operations.

The right to this writ, to enforce its rights under the contract, if the act is applicable to the relator's contract and franchise, by this act is taken away, and thereby the contract of the relator is impaired. *Louisiana* v. *St. Martin's Parish*, 111 U. S. 716; *Walker* v. *Whitehead*, 16 Wall. 314; *Von Hoffman* v. *Quincy*, 4 Wall. 435; *Green* v. *Biddle*, 8 Wheat. 1; *Chicago, Milwaukee &c. Railway Company* v. *Minnesota*, 134 U. S. 418; *Louisiana* v. *New Orleans*, 102 U. S. 203.

III. The court erred in holding that the acts of the legislature of the State of New York of 1885 and 1886, are valid, as applied to the relator's contract and franchise, because said acts provide for the taking away of the relator's rights under its franchise without due process of law.

IV. The court erred in holding that the acts of 1885 and

1886 are proper police regulation, and were passed in the due exercise of the police power of the State.

We do not deny that a State has a right to pass laws to secure good order, to protect the morals, and secure the health and safety of the people of the State. Such right is undoubtedly inherent in a State, and constitutes a part of its sovereignty. There is, however, a limit to which the police power, or the claim of police power of a State can go, and that limit is reached when, by the exercise, or attempted exercise of such power, rights secured by contracts are invaded. A State must not pass laws which shall violate or impair the validity of contracts.

In *New Orleans Gas Light Co.* v. *Louisiana &c. Manufacturing Co.*, 115 U. S. 650 this court said : " Definitions of the police power must, however, be taken subject to the condition that a State cannot in its exercise, for any purpose whatever, encroach upon the powers of the general government, or rights granted or secured by the supreme law of the land."

And statutes passed under the police power of a State cannot take away vested rights. *Fletcher* v. *Peck*, 6 Cranch, 87; *Terrett* v. *Taylor*, 9 Cranch, 43.

*Mr. James C. Carter* and *Mr. Melville Egleston*, by leave of court, filed an intervening brief on behalf of the Metropolitan Telephone and Telegraph Company.

*Mr. David J. Dean* (with whom was *Mr. James Hillhouse* on the brief) for defendant in error.

Mr. Justice Lamar, after stating the case, delivered the opinion of the court.

In the New York courts it was contended by the relator (1) that the aforesaid acts of the legislature of that State passed in 1885 and 1886 were not applicable to it because passed subsequently to the date of the alleged contract between it and the city, of April 16, 1883; (2) that if they were applicable to it, they were violative of the constitution of the State

of New York, for several reasons stated; and (3) that if applicable, they also violated the Constitution of the United States in certain particulars specified. All of the points made by the relator were decided adversely to it in the state courts.

In this court, necessarily, the contention that the acts in question are violative of the constitution of the State is not raised, as we would have no jurisdiction to consider such questions. The contention here on the part of the relator as gathered from the assignment of errors may be thus stated:

(1) The acts of 1885 and 1886 are not applicable to the relator, for the reason urged before the courts of the State; and

(2) If they be held to apply to the relator they are violative of the Constitution of the United States in two particulars: (*a*) They deprive the relator of its property without due process of law; and (*b*) they impair the obligation of the contract made between the relator and the city on the 16th of April, 1883, the date of the acceptance by it of the provisions of the city ordinance of the 10th of that month. All the other points raised may be arranged under one or the other of the above heads.

It will be convenient to consider the questions involved in this case in somewhat the above order. In no sense of the term do we think it can be safely averred that the acts of 1885 and 1886 are not applicable to the relator. The language of both of these acts clearly precludes such a construction. It is declared in the third section above quoted that "*any* company *operating* or *intending to operate* electrical conductors" in the city shall be obliged to file with the Board of Subway Commissioners a "map or maps, made to scale," showing the proposed plan of construction of its underground electrical system; and shall also be obliged "to obtain the approval by said board of said plan of construction so proposed" before any underground conduits shall be constructed. The board is further given the power to compel the construction of the electrical system in accordance with the plans approved by it, and to modify, from time to time, those plans, if the public interest should require it. This language is plain and unambiguous, and is broad enough to include any and every electrical company, irrespec-

tive of the date of its incorporation, operating or desiring to operate, either directly or indirectly, any lines of wire for telegraphic, telephonic, or illuminating purposes within the cities to which it is applicable, the city of New York confessedly being the only one affected.

Neither can it be said that the acts of 1885 and 1886 have a retroactive effect, at least so far as the relator is concerned, since whatever rights it obtained under the ordinance of 1883, which it accepted as the basis of the contract it claims to have entered into, were expressly subject to regulation, in their use, by the highest legislative power in the State acting for the benefit of all interests affected by those rights and for the benefit of the public generally, so long as the relator's essential rights were not impaired or invaded. *New Orleans Gas Company* v. *Louisiana Light Company*, 115 U. S. 650; *Stein* v. *Bienville Water Supply Company*, 141 U. S. 67.

In order to determine whether the relator's essential rights have been invaded, or the contract which it claims to have entered into impaired, or its property taken away without due process of law, it will be necessary to ascertain what rights and property it possesses under the alleged contract of April 16, 1883. This contract, if such it be, must be gathered from the statutes of the State, under which the relator was organized, and the ordinances of the city (which it accepted) by which its privilege of constructing an underground electrical system was conferred. Recurring to the general telegraph act of 1848 and the acts amendatory thereof and supplemental thereto, the material provisions of which are set out above, it is observed that in none of those acts is there any unqualified right conferred upon any electrical company to construct its lines wherever, or in whatever manner it might choose. On the contrary, in every one of those acts provision is made for the security of the rights of the public in the use of the streets and highways which may be used by the electric companies. Thus in the act of 1848 the proviso is that the electric lines "shall not be so constructed as to incommode the public use of said roads or highways, or injuriously interrupt the navigation of said waters." Like restrictions are carried into the acts of

1853 and 1881; and the additional proviso is inserted in the act of 1881 that before any company shall be allowed to construct its lines in any city, village or town it must "first obtain from the common council of cities, the trustees of villages, or the commissioners of highways of towns permission to use the streets within such city, village or town for the purposes herein set forth." Here, then, in express terms, the power is reserved to regulate the use by the electrical companies of all the public highways of the State; and the rights conferred upon such companies are not absolute rights but the qualified right to construct their lines and operate them so as not to interfere with the public easements or the private rights of prior grantees.

Turning now to the ordinances of 1878 and 1883, the provisions of which were accepted by the relator on the 16th of April, 1883, which acceptance, it is claimed, constituted a contract between it and the city, we find that permission was given to the relator to lay its lines of wire underground, in and through the city, in accordance with certain specified plans of construction. These plans are elaborately described in those ordinances; the depth at which the wires are to be placed; the distance the conduits, test-boxes and connection vaults must be placed from underground gas, sewer, steam or water mains; the distance they are required to be from the curbstone; and the method employed in the construction, are all specified with great particularity. And the supervision and control of these matters of excavation and construction, by the ordinance of 1878, devolve upon the commissioner of public works. Conceding, then, for present purposes, without deciding that such was the case, that the relator had a contract with the city of New York for the laying of its wires, and the construction of its underground electrical system, the terms of the contract, as found in the statutes and the ordinances, gave the relator only the right to carry out the purposes of its organization in a manner which will in nowise interfere either with other underground systems and connections, such as gas, sewer, and water systems, already established and in operation, or with the rights of the public to use the streets, avenues and

highways of the city for the purposes of general travel. The rights of the public and the rights of prior occupants are to be respected and protected.

In what way, therefore, did the acts of 1885 and 1886 impair this contract? Did they take from the relator any rights which it theretofore possessed? Did they prohibit it from laying its lines and constructing its underground electrical system in accordance with the terms, and subject to the restrictions and conditions, of its said contract with the city? We think all these questions must be answered against the relator. The only thing that the acts of 1885 and 1886 did in this matter was to create a Board of Subway Commissioners whose duty it was to carry out the provisions of the ordinances of the city and the prior acts of the legislature relating to electric lines. The statutes of 1885 and 1886 did not prohibit the relator from carrying out the purposes of its organization or from laying its wires underground. They simply said to it, "Submit your plans and specifications of your electrical system to the Board of Subway Commissioners, who will determine whether they are in accordance with the terms of the ordinances giving you the right to enter and dig up the streets of the city." This the statutes had a right to do. It would be an anomaly in municipal administration, if every corporation that desired to dig up the streets of a city and make underground connections for sewer, gas, water, steam, electricity or other purposes, should be allowed to proceed upon its own theory of what were proper plans for it to adopt, and proper excavations to make. The evils that would follow from such a system of practice would be of great gravity to the public and would entail endless disputes and bickerings with prior parties having equal rights. The utmost that can be said against the acts of 1885 and 1886 is, that they transferred the supervision and control of the matters of excavation of the streets and the construction of underground electric systems from the commissioner of public works to the Board of Subway Commissioners. That is the sum total of the change effected. Not a right of the electrical companies was violated, and no contract was impaired. The expressly reserved power of the State or municipality to regu-

late the use of the streets and highways in such manner as not to injuriously affect the public interests was merely transferred from one public functionary to another. The power was not enlarged; only the agency by which the supervising power of the State was to be exercised was changed. It requires no argument or citation of authorities to demonstrate that such proceedings did not impair the obligation of the relator's contract. If it did, every act of incorporation would involve a loss of authority by the legislature to change its public functionaries, or their respective powers and duties.

Independently, however, of the contractual relations of the relator, the statutes of 1885 and 1886 are so clearly an exercise of the general police powers of the State that we do not deem it necessary to add anything on that point to what was said by the Court of Appeals of New York. 107 N. Y. 593, 603, 604.

The contention that the statutes referred to deprive the relator of its property without due process of law is equally without foundation. This argument rests upon the assumption that the legislature could not require the electric companies to pay the salaries of the subway commissioners, as provided in section 7 of the act of 1885, as amended in 1886; and that this requirement of the statute is in violation of the Fourteenth Amendment to the Constitution of the United States. This contention cannot be sustained under the principles of *Charlotte &c. Railroad* v. *Gibbes,* 142 U. S. 386. In that case it was held that a statute of South Carolina, requiring the salaries and expenses of the state railroad commission to be borne by the several corporations owning or operating railroads within the State, was not in conflict with the Fourteenth Amendment, which provides that no State shall "deprive any person of life, liberty or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

There are no other features of the case that call for special consideration.

*Judgment affirmed.*