# CITY OF NEW YORK v. DAVIS, Director General of Railroads.

(Circuit Court of Appeals, Second Circuit. April 20, 1925.)

No. 304.

1. Railroads ⊗⇒75(3)—New Haven Railroad acquired right from state to operate by electricity without requiring franchise from city.

Under Laws 1866, c. 763, and Laws 1903, c. 425, New Haven Railroad, as lessee of the Harlem River & Port Chester Railroad, obtained from state of New York right to operate its road over Westchester avenue in borough of the Bronx by "steam or any motive power," with a right to use electricity in its operation without requiring any secondary franchise from the city of New York, subject to right of state, in exercise of its police power, to regulate operation of railroad for prevention of injuries to persons or property.

2. Constitutional law ⊗⇒63(2)—State may delegate police power to municipality.

State may delegate to a municipality right to exercise police power within municipal limits.

3. Railroads ⊗⇒5 — Railroad company subject to police power.

Railroad company, or any other quasi public corporation, is subject to police power of state; such corporations exercising their franchises subject to reserved power of state to enact all police laws which are necessary and proper to conserve lives, property, and safety of people.

4. Railroads ⊗⇒75(3)—Electric cables erected by railroad above street held not illegal, so as to preclude railroad from recovering cost of relocation to permit construction of municipal railroad.

Overhead electric cables, erected by New Haven Railroad above Westchester Avenue Bridge, in borough of the Bronx, city of New York, without applying for permission in accordance with New York City Charter, § 528, held not illegal structures, so as to preclude railroad from recovering reasonable cost of relocating such cables, so as to permit construction of municipal railroad through such avenue, where right of railroad to operate its line in city by electricity was derived from state, of which it could not be deprived by city, and, assuming that city had right to order cables to be placed underground, or to be maintained at

a certain height above the ground, no such order was at any time made.

**5. Contracts ⬤⟹5—No defense to action based on quasi contract to allege that parties did not contract.**

Where an action is based on quasi contract, it is no defense to allege that the parties did not contract.

**6. Municipal corporations ⬤⟹249—Corporation liable on quantum meruit.**

A public corporation, like a private individual, may be liable on a quantum meruit, if, having power to make a contract, but having made none, it has nevertheless enjoyed benefit of work performed or materials furnished to it, when no statute forbids or deprives it of the power to contract therefor.

**7. Municipal corporations ⬤⟹249 — Railroad held entitled to recover from city reasonable cost of relocating overhead electric cables to permit construction of municipal railroad.**

New Haven Railroad held entitled to recover from city of New York reasonable cost of relocating its overhead electric cables, to permit construction of municipal transit line over an overhead bridge, where city, acting through its proper agents, had right to build such railroad within limits of city, and it was necessary to relocate cables used by railroad, and railroad, on request of Public Service Commission, raised its cables sufficiently to permit municipal railroad to pass over its tracks, and work was performed satisfactorily to commission, and reasonable value of labor and materials furnished in performance thereof amounted to sum demanded by railroad.

**8. Contracts ⬤⟹4—Contracts "implied in fact" and those "implied in law" distinguished.**

A contract "implied in fact" is an implied contract in which the intention is ascertained and enforced, while a contract "implied in law" is a quasi contract, in which the contract is a mere fiction; the intention being disregarded, and the quasi contractual obligation being imposed by law to bring about justice, without regard to the intention of the parties.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Implied Contract.]

**9. Municipal corporations ⬤⟹249—Municipality liable on quantum meruit for necessaries.**

When services are rendered or materials are furnished to a municipal corporation, which are necessaries, and which city has accepted and had benefit of, it is liable on quantum meruit for reasonable value thereof, even though there is no valid contract between the parties.

**10. Statutes ⬤⟹183—Intention of statute ascertained, where literal interpretation may lead to absurdity and fail to express real intent of Legislature.**

Where literal interpretation of a statute may lead to absurdity and fail to express real intent of Legislature, courts resort to principle that spirit of law controls letter, and a thing which is within intention of statute is as much within statute as if it were within letter.

**11. Municipal corporations ⬤⟹230 — Public Service Commission of New York City, in constructing municipal railway, had authority to contract with railroad for relocation of overhead electric cables.**

Where Public Service Commission of the First District, in New York City, had authority, under Rapid Transit Act, to complete construction of municipal railway through avenue crossing the New Haven Railroad, and to accomplish such result relocation of overhead electric cables of railroad was necessary, commission had authority to contract with railroad for relocation of its feed wires; such relocation being a "necessary" step in the successful prosecution of the work, and section 26, subd. 2, as amended by Laws 1917, c. 625, being inapplicable.

**12. Municipal corporations ⬤⟹230 — Express power implies right to do act reasonably necessary to give effect to power.**

Express power to Public Service Commission, granted by statute to do a particular act, carries with it by implication right to do any act, not prohibited, which may be found reasonably necessary to give effect to power expressly granted.

**13. Statutes ⬤⟹195—Courts not governed by maxim of construction, when to apply it would defeat accomplishment of manifest purpose of the act.**

When to apply the maxim, "expressio unius exclusio alterius," would defeat the accomplishment of the manifest purpose of an act and prevent the attainment of the end for which it was passed, courts must decline to be governed by it.

**14. Municipal corporations ⬤⟹342 — Approval of contract by board of estimate and apportionment unnecessary, where amount involved is less than $25,000.**

Under Rapid Transit Act, §§ 36, 37, as added by Laws 1894, c. 752, providing for construction of municipal railway within city of New York, no further consent of board of estimate and apportionment is necessary, where in course of its work, undertaken with approval of the board of estimate and apportionment, Public Service Commission finds it necessary to employ persons or purchase or hire tools, machinery, etc., when amount involved is less than $25,000.

**15. Municipal corporations ⬤⟹249—City benefited by relocation of railroad's overhead electric cables to permit construction of municipal railway.**

In action by railroad to recover of New York City reasonable cost of relocating its overhead electric cables to permit construction of municipal railway, claim that city was not benefited by such relocation held not sustained, where Public Service Commission admitted that it was necessary to permit construction of the municipal railroad which commission was then engaged in building for the city, and for the cost of which relocation commission had agreed that city should pay.

In Error to the District Court of the United States for the Southern District of New York.

Action by James C. Davis, Director General of Railroads (New York, New Haven & Hartford Railroad Company), against the City of New York. Judgment for plaintiff, and defendant brings error. Affirmed.

The defendant in error was the plaintiff below, and hereinafter will be referred to as plaintiff. The plaintiff in error was defendant below, and hereinafter will be referred to as defendant. The action was brought to recover for work, labor, and materials furnished by the plaintiff for the defendant in connection with the relocation of the feeder cables of the New York, New Haven & Hartford Railroad Company, hereinafter called the New Haven Road, in order to permit the construction of a municipal rapid transit railway line through Westchester avenue, in the borough of the Bronx, in the city of New York.

The plaintiff has obtained a judgment in the sum of $10,855.02, entered against defendant after a trial before the court without a jury. There were no disputed questions of fact. All of the facts were conceded and set forth in a stipulation read into the record on the trial.

The Harlem River & Port Chester Railroad Company was incorporated by chapter 763 of the Laws of 1866 of the state of New York, was completed about 1873, and in that year was leased to the New Haven Road for a term of 99 years. In 1881 the city of New York acquired title by condemnation to Westchester avenue, where the same crosses the right of way of the railroads, subject to the latter's perpetual easement for railroad purposes. In September, 1873, the railroad was leased to the New Haven Road, pursuant to the provisions of the Railroad Law.

In 1903 an agreement was made between the city and the New Haven Road, which provided for the construction of a bridge to carry Westchester avenue across the railroad tracks. In 1904 the railroad company instituted plans to widen the right of way, construct additional tracks, and eliminate grade crossings. An agreement was made with the city, which provided for the laying of these additional tracks and for the construction of bridges to carry the streets either over or under the railroad. Among the streets, the grade of which was to be raised, was Westchester avenue.

Up to 1912 the railroad had been operated by steam power. In that year its electrification was commenced, and the feeder cables were carried along the right of way and under the Westchester Avenue Bridge. It appears that this method of maintaining the electric feeder cables caused interference with the existing wires of the telephone and telegraph companies in the vicinity, and in 1913 said feeder cables were taken from their location under the bridge and constructed over and across the bridge. It was conceded that neither the owner railroad company nor the lessee railroad company ever obtained written permission for the construction of these feeder cables across and above Westchester avenue from the commissioner of water supply, gas and electricity of the city of New York, which the latter now claims should have been obtained pursuant to section 528 of the City Charter (Laws 1901, c. 466).

In 1915 the Public Service Commission contracted for the construction of an elevated rapid transit railway through Westchester avenue and over the bridge carrying said avenue across the tracks of the railroad company. The commission found that it would be necessary to raise the position of the feeder cables above mentioned, and which had been construed in 1913, so as to permit the rapid transit railway to pass under the same without interference. At the commission's request the plaintiff prepared plans for the raising of these feeder cables, which were thereupon submitted by the commission to the contractor, who was then constructing the rapid transit railway under contract with the city made through the commission.

In 1917, owing to the default of the contractor, the construction of the rapid transit railway was taken over and conducted by the city itself, through the commission. It appears that the railroad company, through some arrangement with the commission which the city claims to have been unauthorized, undertook to perform some portions of the work of raising the feeder cables. The cost of the work is the subject of this action. In December, 1917, after the original rapid transit construction contract had been canceled by default, the commission prepared a form of contract to be entered into between the city and the New Haven Road for the work of relocating the feeder cables at the city's expense. This proposed contract was approved by the commission on January 18, 1918. The commission then requested the board of estimate and apportionment of the city to approve the proposed contract and to direct the comptroller of the city to procure the necessary funds

for the payment of the cost of the work. By resolution adopted on May 3, 1918, the board refused to approve the contract or authorize the appropriation, as the corporation counsel had advised the board that the company had never obtained permission from the commissioner of water supply, gas and electricity to string its feeder cables over Westchester avenue, and that said feeder cables were therefore unlawful and such structures as the city should not pay the expense of raising or relocating.

The commission then advised the plaintiff that, owing to the refusal of the board to appropriate the moneys, the commission was estopped from proceeding with the execution and delivery of the contract. The plaintiff nevertheless performed the work, and thereupon made a demand upon the comptroller for the payment of the sums expended by it in raising the feeder cables, and, upon the comptroller's refusal to pay such claim, instituted this action to recover the said sums. Judgment was entered in the court below for the plaintiff in the sum of $7,991.73, with interest from July 9, 1918.

George P. Nicholson, Corp. Counsel, of New York City (Alex I. Hahn and Joseph A. Devery, both of New York City, of counsel), for plaintiff in error.

Charles M. Sheafe, Jr., of New York City (William L. Barnett and Edward R. Brumley, both of New York City, of counsel), for defendant in error.

Before ROGERS, HOUGH, and HAND, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). This action was begun in October, 1920. At that time the Director General of Railroads, an official whose office was established during the World War and by the act of 1918 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 3115¾a–3115¾p), was still in charge of the railroads of the United States, and consequently of the New Haven Road. This suit was therefore brought in his name. It appears from the statement of facts, which precedes this opinion, that the action was brought to recover the reasonable cost of relocating the overhead feeder cables of the New Haven Railroad, to permit the construction of the municipal rapid transit line through Westchester avenue in the Bronx.

The action is not brought upon an express contract. No such contract was alleged, and none has been proved. The suit is on quantum meruit. It is alleged that the

plaintiff, or his predecessor, at the special instance and request of the defendant and for its benefit, furnished certain work, labor, and materials, and raised its electric feed wires at a point in Westchester avenue where the defendant was engaged in constructing a new rapid transit railroad, the route for which crossed the New Haven Company's railroad and over a certain highway bridge at that point; and the defendant claims that it cannot be held liable on the basis of an implied or quasi contract to pay for the work which the plaintiff did.

The defendant relies in this court on the following defenses:

(1) That the feeder cables, the cost of the relocation of which is the basis of this action, were illegal structures, in that their original location or installation in the street was never consented to in writing by the commissioner of water supply, gas and electricity of the city of New York pursuant to section 528 of the charter of the city of New York.

(2) That neither the Public Service Commission nor any of its agents or employees had any power under the Rapid Transit Act of New York to contract on behalf of the city of New York, without the approval of the board of estimate and apportionment, for the performance of the work. The board's approval was never given, and no appropriation for the work was ever made as required by the act.

(3) The commission, when constructing rapid transit railways, had no right to remove or cause to be removed or relocated any overhead structures in the street which might interfere with the construction of such railways.

It appears that the charter of the city of New York, in section 528, provides as follows: "No electrical conductors, shall be strung, laid or maintained above or below the surface of any street, avenue, highway or other public place, in any part of said city without permission in writing from said commissioner therefor."

We shall consider first the claim that the plaintiff had no right to maintain its feeder cables across Westchester avenue as it had not obtained the consent of the commissioner of water supply, gas and electricity of the city of New York to their construction as required by section 528 of the city's charter. The plaintiff's right was derived from an act of the Legislature of the state of New York passed in 1866. The wires were on the line of the Harlem River & Port Chester Railroad Company, which was

leased to the plaintiff in 1873 for 99 years. The aforesaid Harlem Railroad was incorporated under the laws of the state of New York in 1866. Chapter 763 of the Laws of 1866 provided as follows:

"Section 1. It shall be lawful for * * * to construct, maintain and operate a railroad, with all necessary depots, buildings, apparatus and fixtures, from some point at or near the Byram river, at the village of Portchester, in the town of Rye, in the county of Westchester and state of New York, to Harlem River, in said county, passing through or near * * * Westchester, West Farms and Morrisiana. * * *

"Sec. 2. Such road may be operated by steam or any other motive power.

"Sec. 3. Whenever it shall be necessary in the construction of said road, to intersect or cross any * * * road or highway, it shall be lawful for the corporation to construct their road across or upon the same. * * * "

Under this act it had the right to use "any * * * motive power" and to "intersect or cross any * * * road or highway." In 1881 the city of New York acquired title to the highway known as Westchester avenue in the borough of the Bronx, where the same crosses the right of way of the railroad. The city thereby acquired the fee in the bed of the street, subject to the easement of the railroad company. By chapter 425 of the Laws of 1903 the state required the New Haven Road to electrify its main lines in Park avenue, terminating at the Grand Central Terminal. As a necessary result of that statute the New Haven Company electrified also its branch line leased from the Harlem River & Port Chester Railroad Company. The electric feed wires herein involved were originally installed in 1912, together with the necessary apparatus and fixtures to the operation of the railroad by electricity.

The law of 1884 (Laws 1884, c. 534), as amended by the law of 1885 (Laws 1885, c. 499), was the first compulsory law of New York requiring overhead lines to be put underground in cities of over 500,000 inhabitants. Prior to that legislation the railroad had the right in the city of New York to use as a motive power electricity, and its right was not dependent upon the consent of the authorities of the city of New York. See Holmes Electric Protective Co. v. Williams, 228 N. Y. 407, 420, 422, 127 N. E. 315.

[1, 2] It is undoubtedly true that the plaintiff obtained from the state of New York the right to operate its road over the locus in quo by "steam or any other motive power." Its right to occupy the locus in quo and to use electricity in the operation of its railroad did not require any secondary franchise from the city of New York. But it is equally undoubted that the state, in the exercise of its police power, could regulate the operation of the railroad for the prevention of injuries to persons or property. It is in the exercise of police power that courts have sustained the right to require railroads to fence their right of way, to erect and maintain cattle guards, to limit the speed of their trains, and to make use of air brakes and safety devices. Also there is no doubt that in cities like New York the police power could authorize a requirement that its electric cables and wires, at points where the railroad crosses a street or highway, should be placed underground. Neither do we doubt the power of the state to delegate to a municipality the right to exercise the police power within the municipal limits. While the state of New York had delegated certain of its police power to the city of New York, that municipality could not deprive the plaintiff of its franchise right to operate its railroad within the city, or prevent it from using electricity as a motive power therein.

[3] A railroad company, like a telegraph company, or an electric light company, or any other quasi public corporation, is subject to the police power of the state. All such corporations exercise their franchises subject to the reserved power of a state to enact all police laws which are necessary and proper to conserve the lives, the property, and the safety of the people. In Chicago, Burlington & Quincy Railroad Co. v. Chicago, 166 U. S. 226, 252, 17 S. Ct. 581, 590 (41 L. Ed. 979), the court said:

"The plaintiff in error took its charter subject to the power of the state to provide for the safety of the public, in so far as the safety of the lives and persons of the people were involved in the operation of the railroad. * * * The requirement that compensation be made for private property taken for public use imposes no restriction upon the inherent power of the state by reasonable regulations to protect the lives and secure the safety of the people. In the recent case of N. Y. & N. E. Railroad v. Bristol, 151 U. S. 556, 567 [14 S. Ct. 437, 38 L. Ed. 269], this court declared it to be thoroughly established that the inhibitions of the Constitution of the United States upon the impairment of the obligation of con-

tracts, or the deprivation of property without due process or of the equal protection of the laws, by the states, are not violated by the legitimate exercise of legislative power in securing the public safety, health, and morals."

In People of the State of New York v. Squire, 145 U. S. 175, 12 S. Ct. 880, 36 L. Ed. 666, the Supreme Court sustained the validity of an act of the Legislature of New York (Laws 1885, c. 499), under which companies operating electrical conductors in a city might be required to remove the same from the surface of the streets and put them underground. It was held that such an act did not constitute a violation of the Constitution of the United States. That the legislation did not violate the Constitution of the state of New York and was a legitimate exercise of the police power of the state, had been previously decided in People v. Squire, 107 N. Y. 593, 14 N. E. 820, 1 Am. St. Rep. 893.

And where the property of any person is taken under the eminent domain power, whatever is taken must be paid for; but that doctrine is not applied to a taking under the police power. Under the police power property rights may be cut down, and to that extent taken, without compensation. Block v. Hirsh, 256 U. S. 135, 155, 41 S. Ct. 458, 65 L. Ed. 865, 16 A. L. R. 165. The Fourteenth Amendment, in declaring that no state shall "deprive any person of life, liberty or property, without due process of law," does not deprive the states of their police power, and they may exercise those powers as fully as before its adoption. Chicago, Rock Island & Pacific Railway Co. v. Shaffer, 263 U. S. 687, 44 S. Ct. 228, 68 L. Ed. 507; Rast v. Van Deman & Lewis, 240 U. S. 342, 357, 358, 36 S. Ct. 370, 60 L. Ed. 679, L. R. A. 1917A, 421, Ann. Cas. 1917B, 455; Minneapolis, etc., R. Co. v. Beckwith, 129 U. S. 26, 9 S. Ct. 207, 32 L. Ed. 585; Mugler v. Kansas, 123 U. S. 623, 8 S. Ct. 273, 31 L. Ed. 205; Barbier v. Connolly, 113 U. S. 27, 5 S. Ct. 357, 28 L. Ed. 923. The Slaughter House Cases, 16 Wall. 36, 21 L. Ed. 394. Corporations occupy the same position as private individuals in respect to the police power. But we are not now concerned to inquire whether the Legislature has imposed any unreasonable restrictions upon the complainant's right to maintain its electric cables across Westchester avenue. No such question is here.

The plaintiff, however, insists that section 528 of the charter was intended to apply to electrical conductors strung, laid, or maintained over or below the surface of any street, avenue, highway, or other public place, when the electrical conductors are strung, laid, or maintained *along the street,* avenue, highway, etc., and that they do not apply when the electric wires or cables are strung, laid, or maintained along a railroad right of way and incidentally cross a street or avenue.

Prior to 1884 the telegraph, telephone, and electric light companies in the city of New York had the right, under their franchises, to string their wires upon poles placed in the streets. This was deemed dangerous, not only to pedestrians, but also to those engaged in the ordinary street traffic. A plan was devised for putting the wires underground in subways constructed for that purpose, and statutes were enacted creating a board of commissioners of electrical subways. The history of this legislation and the transactions thereunder are set forth fully in Matter of City of New York v. Prendergast, 202 App. Div. 308, 195 N. Y. S. 815. It is not necessary for us to review the subject at this time, and we do not need to determine in this case whether section 528 extends only to cases *along* a street, avenue, highway, etc., or whether it also was intended to apply to electrical conductors strung along a railroad's right of way whenever it crosses a street or avenue.

As the right of the New Haven Road to maintain its tracks in the city of New York, and to use electricity as a motive power, was derived directly from the state, the Public Service Commission of the First District decided, when that company applied to it in 1908 for permission to change its motive power from steam to electricity, its charter providing that the road might be operated "by steam or any other motive power," that the application for the commission's consent was unnecessary, inasmuch as the company was "authorized to make such change without the consent or the approval of this commission." Case No. 1001, 1 P. S. C. 427.

The record also discloses that in 1908 the commissioner of the department of water supply, gas and electricity of the city applied to the Public Service Commission for an order directing the New York Central Railroad to install its electric wires within the city of New York in a particular manner. But the commission decided that the department had no authority or control over the electric wires and appurtenances for electrical operation of the said road within the

city of New York, and that no permit of the department was required as a condition to the erection and maintenance of the wires by the road either on its private right of way or at street intersections.

At the time these decisions were made, and for a number of years prior thereto, the charter of the city of New York contained section 528, hereinbefore quoted, and which the city in this case now relies upon, which provides that no electrical wires shall be maintained "above or below the surface of any street, avenue, highway or other public place in any part of said city" without permission in writing from the commissioner of the department of water supply, gas and electricity.

When the New Haven Road in 1912 electrified its right of way, and with the above decisions of the Public Service Commission, apparently acquiesced in by the city and standing then, as now, unreversed, it strung its wires along its right of way and under, and later above, the Westchester Avenue Bridge, without applying for permission in accordance with the provision of section 528. Its right to do this does not seem to have been challenged by the city of New York until the pending controversy arose in 1918. The right to do what the plaintiff did was not then questioned by the Public Service Commission, which had consented to enter into a contract with the road for the relocation of the wires. This relocation was made necessary by the construction of the new Municipal Rapid Transit Railway then being built. It was agreed that the New Haven Road should relocate its wires, and that the city should pay the actual and necessary net cost for the labor and materials used in the performance of the work. This agreement failed because the board of estimate and apportionment of the city refused to consent to the contract and to appropriate the money which was called for under it. That refusal was predicated upon the fact that the corporation counsel of the city had advised the board that the New Haven Company was maintaining its wires without lawful authority—no permission ever having been given to it or applied for by it to string or maintain its wires over the Westchester Avenue Bridge.

[4] But the right of the New Haven Company to operate its line in the city by electricity was derived from the state, and it could not be deprived of that right by the city. The most the city could do, assuming that section 528 of the charter applied, was

to determine whether the wires should be strung above ground or below ground, and the manner in which this should be done. No order on the subject was ever made by the commission, so far as this record discloses. If the city, under such circumstances, had applied for an injunction to stop the running of the New Haven trains by the use of electricity across the Westchester Avenue Bridge, on the ground that the wires were unlawfully strung, it is hardly to be supposed that an injunction would have been issued. Granting, for the purpose of the argument, that the commission had power to prescribe the manner in which the company should place its wires within the city, so long as the city failed to exercise that power, we think it cannot be claimed that the New Haven Company was unlawfully maintaining its wires across the Westchester Avenue Bridge. The company, having an unquestioned right granted directly by the state to use electricity as a motive power, had a lawful right to have its wires cross Westchester avenue. Granting that the city had the right to order the wires underground, it at no time did so. Granting that the city, through its agency, the Public Service Commission, might have ordered the wires to be maintained at a certain height above ground, no such order was at any time made, neither before nor since this controversy arose. Under the circumstances, we think the wires as strung across the Westchester Avenue Bridge were not there unlawfully.

The second defense is not a denial of the right of the city of New York to enter into a contract with the plaintiff for the services and materials it furnished and for reasonable value for which this suit is brought. It merely states that the Public Service Commission had no power to contract on behalf of the city *without* the approval of the board of estimate and apportionment, and that no such approval was ever obtained and no appropriation for the work was ever made.

[5-7] But this action is not brought on contract, and there is no allegation that any contract for the performance of the work was ever entered into between the plaintiff and the defendant. The action is based on quasi contract, and it is no defense to such an action to allege that the parties did not contract. The nature of the action in itself admits that the parties did not enter into a contract. But the fact remains that a public corporation, like a private individual, may be liable on a quantum meruit if, hav-

ing the power to make a contract, but having made none, it has nevertheless enjoyed the benefit of work performed or materials furnished to it, when no statute forbids or deprives it of the power to contract therefor. The second defense seems to imply that the city of New York, acting through its agency, the Public Service Commission for the First District, and with the approval of the board of estimate and apportionment, might have contracted for the performance of this work. It is undisputed that the city of New York, acting through its proper agents, had the right to build a municipal rapid transit railroad within the limits of the city, a portion of which railroad extended along and over Westchester avenue and over the right of way of the New Haven Railroad. It is also undisputed that in the prosecution of this work it was necessary to relocate the feed and other wires used by the New Haven Road; and it is further undisputed that the New Haven Road, on the request of the Public Service Commission of the First District, and in accordance with a plan mutually agreed upon between them, raised its electric feed wires, and furnished new steel poles therefor to a height sufficient to permit the Municipal Rapid Transit Railroad to pass over the New Haven Road where the route of the former crossed the latter's at Westchester avenue.

Neither is it denied that this work was in all respects performed in a manner satisfactory to the Public Service Commission. Neither is it seriously denied that the reasonable value of the labor and materials furnished in its performance of the work amounted to the sum demanded by the plaintiff, and which was awarded to it in the court below. Upon such a state of facts, we have no doubt that the plaintiff is entitled to the judgment which has been entered in its favor in the court below.

[8] A distinction exists between contracts implied in fact and those which are implied in law. The former are implied contracts, and the latter are quasi contracts. In a quasi contract the contract is a mere fiction; the intention being disregarded. In an implied contract the intention is ascertained and enforced. "In one, the intention is disregarded; in the other, it is ascertained and enforced." Hertzog v. Hertzog, 29 Pa. 465, 468. A quasi contractual obligation is imposed by law for the purpose of bringing about justice, without regard to the intention of the parties.

In quasi contract there is no contract ob-

ligation in the true sense, for there is no agreement; but it is clothed with the semblance of contract for the purpose of the remedy. Nevada Co. v. Farnsworth (C. C.) 89 F. 164; See People v. Dummer, 274 Ill. 637, 641, 113 N. E. 934; Mathie v. Hancock, 78 Vt. 414, 417, 63 A. 143. In 40 Cyc. 2807, the law is stated as follows:

"But where an obligation is imposed by law upon one to do an act and he fails to perform it, because of the interest of the public in its performance, one who does perform it, with the expectation of receiving compensation, is entitled to recover."

In Williston on Contracts, vol. 1, § 3, that writer says:

" * * * All rights enforced by the contractual actions of assumpsit, covenant, and debt were regarded as based on contracts. Some of these rights, however, were created, not by any promise or mutual assent of the parties, but were imposed by law on the defendant irrespective of, and sometimes in violation of, his intention. Such obligations were called implied contracts. A better name is that now generally in use of 'quasi contracts.' This name is better, since it makes clear that the obligations in question are not true contracts, and also because it avoids confusion with another class of obligations, which have also been called implied contracts. This latter class consists of obligations arising from mutual agreement and intent to promise, but where the agreement and promise have not been expressed in words. Such transactions are true contracts, and have sometimes been called contracts implied in fact."

In 13 C. J. 244, it is said:

"Contracts implied in law, or more properly quasi or constructive contracts, are a class of obligations which are imposed or created by law without regard to the assent of the party bound, on the ground that they are dictated by reason and justice, and which are allowed to be enforced by an action ex contractu."

In Woodward's Quasi Contracts, § 161, the law on this subject is well stated as follows:

"It is a generally accepted rule of policy that a municipal corporation is under no obligation to make restitution for a benefit received under an ultra vires contract entered into by its officers, in case such restitution would increase the burden of taxation upon the members of the municipality. * * * Where, on the other hand, restitution would impose no burden on taxpayers, a recovery

in quasi contract is permitted. Instances of this kind are found in cases of ultra vires contracts, under which money is received by the corporation which either remains in the treasury or is expended for legitimate corporate purposes. * * *

"It is necessary to distinguish between a benefit for which a municipal corporation has no power to contract and a benefit for which it has the power to contract, but which is actually received under a contract ultra vires because of its terms, or void because of noncompliance with some formal or preliminary requirement of law, or because of an agent's want of authority. If a benefit is one which might have been lawfully obtained, restitution in value would not impose an unauthorized burden upon the taxpayers. * * * Whether or not a quasi contractual obligation arises from the receipt of a benefit under a contract not in substance or in terms beyond the power of the corporation to enter into, but void because of noncompliance with a formal or preliminary requirement relating to its formation, is a question upon which the authorities differ.

"Much depends, it is submitted, upon the purpose of the requirement and the extent to which it is disregarded. If the irregularity is such as to deprive the municipality of protection of a safeguard against the extravagance or corruption of its officers—as a substantial failure to comply with a requirement that contracts shall be let to the lowest bidder after due publication of notice—recovery should be denied. But if the irregularity is of a character that does not prejudice or endanger the interests of the municipality, as a failure to renew in writing, as required by law, a contract for gas supply, recovery should be allowed."

[9] The law thus stated is supported by the decisions of the courts of New York. See Hart v. City of New York, 201 N. Y. 45, 55, 94 N. E. 219; Kramrath v. City of Albany, 127 N. Y. 575, 28 N. E. 400; Port Jervis Water Co. v. Port Jervis, 71 Hun. 66, 24 N. Y. S. 497; Id., 151 N. Y. 111, 45 N. E. 388; Moore v. Mayor, 73 N. Y. 238, 29 Am. Rep. 134; Electric Light & Power Co. v. City of New York, 48 App. Div. 14, 62 N. Y. S. 726; Staten Island Water Supply Co. v. City of New York, 144 App. Div. 318, 128 N. Y. S. 1028; Sheehan v. City of New York, 37 Misc. Rep. 432, 75 N. Y. S. 802; Wilkins v. Mayor of New York, 9 Misc. Rep. 610, 30 N. Y. S. 424. The cases show that, when services are rendered or materials are furnished to a municipal corporation, which are necessaries, and which the city has accepted and had the benefit of, it is liable on quantum meruit for the reasonable value of such services or materials, even though there is no valid contract between the parties.

The defendant's counsel, appreciating the force of the cases above referred to, contends that they do not apply to the facts of the case under consideration. They tell us that in the above cases recovery was allowed because the materials or services were furnished to supply a reasonable necessity; and then they add that in the pending case there was "no reasonable necessity" for which the city could in any way be charged. It is admitted that the rapid transit railway could not have been constructed without the relocation of the cables. It is sought to escape from the effect of this admission by saying that this relocation would not have been necessary if the cables had been originally placed in a proper position.

We are told that it was no more necessary for the city, at its own expense, to relocate the feeder cables than it would have been to remove or compel the removal of any unauthorized structure in the street. One of the difficulties with this argument is that it proceeds upon the theory that the plaintiff had no right originally to construct its cables along the line of road in the manner it did, but acted unlawfully and without authority. As we have already decided that question adversely to the city, the contention must fail that the relocation of the cables was no more a "necessary" expense for the city to incur than would be the expense of the removal of any unauthorized structure from the street. The premise being unsound, it does not support the conclusion.

We come now to the consideration of the third defense. It is said that the city of New York cannot be held on the theory of quasi or implied contract, as the Public Service Commission had no power to contract for the removal of *overhead structures*. It is asserted that the commission's power is limited exclusively to street surface railroad tracks and *underground structures*, and that there is no provision in the Rapid Transit Act which authorizes the commission to remove or contract for the removal or relocation of overhead structures, while the act expressly gave the commission the right to locate or relocate surface or subsurface structures. We are not impressed by the fact that the act contains no express statu-

tory authorization to cause the relocation of overhead structures.

[10] The literal interpretation of a statute may lead to absurdity and fail to express the real intent of the Legislature. In such cases courts resort to the principle that the spirit of the law controls the letter, and a thing which is within the intention of the statute is as much within the statute as if it were within the letter. Gray v. Pearson, 6 H. L. C. 106; Riggs v. Palmer, 115 N. Y. 506, 22 N. E. 188, 5 L. R. A. 340, 12 Am. St. Rep. 819; Green v. Kemp, 13 Mass. 515, 7 Am. Dec. 169; Brown v. Wright, 13 N. J. Law, 240.

[11] The fact is that the commission had authority to complete the construction of the Rapid Transit Railway line through Westchester avenue. In order that this might be accomplished, the relocation of the overhead feeder cables of the New Haven Road was necessary. The Public Service Commission had notified the road that the relocation was "necessary," and that such relocation was necessary in fact has not been controverted. We have no doubt that, under the authority conferred to construct the Rapid Transit line, authority existed to contract with the New Haven Road for the relocation of its feed wires; such relocation being a "necessary" step in the successful prosecution of the work.

[12, 13] Where an express power is granted to do a particular act, this carries with it by implication the right to do any act, not prohibited, which may be found reasonably necessary to give effect to the power which has been expressly granted. Pittsburgh, Cincinnati & St. Louis Railway Co. v. Keokuk & Hamilton Bridge Co., 131 U. S. 371, 9 S. Ct. 770, 33 L. Ed. 157. And we are not inclined to deny the application of the above well-established rule to the facts of this case, because the Rapid Transit Act has given express power to relocate surface or subsurface structures, and omitted any reference to overhead structures. We do not lose sight of the maxim "Expressio unius exclusio alterius." But, while the maxim is a sensible and useful one, it is not of universal application, and when to apply it would be to defeat the accomplishment of the manifest purpose of the act, and to prevent the attainment of the end for which the act was passed, we certainly must decline to be governed by it. In United States v. Barnes, 222 U. S. 513, 519, 32 S. Ct. 117, 118 (56 L. Ed. 291), the Supreme Court said of this maxim: "The max-

im invoked expresses a rule of construction, not of substantive law, and serves only as an aid in discovering the legislative intent, when that is not otherwise manifest. In such instances, it is of deciding importance; in others, not."

In the case now before us the legislative intent is not open to question and is otherwise manifest than by a resort to the maxim. And in Saunders v. Evans, 8 H. L. C. 729, Lord Chancellor Campbell, declaring that the maxim was not of universal application, said that it depended upon intention, and that, where the intent could be discovered upon the face of the instrument, that intent was not to be defeated by the application of the maxim. In this case there is no occasion to resort to the maxim, for the intent is plainly disclosed upon the face of the statute.

The contract implied from the commission's request to the New Haven Company to relocate its wires were not, in our opinion, within subdivision 2 of section 26 of the Rapid Transit Act (Laws 1891, c. 4, as amended by Laws 1917, c. 625). That provides as follows:

"In any case where any such contract which shall have been entered into provides that upon the happening of any event or default specified in such contract the said commission shall have the right and be entitled to take over and perform or complete or contract for the performance or completion of the work embraced in said contract or any part of such work, the said commission, upon the happening of any such event or default so specified in such contract, may also with the approval of the board of estimate and apportionment, or other analogous local authority of said city, employ such persons and purchase or hire such plant, tools, machinery, supplies and materials as may be necessary, and itself perform or complete the work embraced in said contract or any part of such work as in its judgment the public interests require."

This seems to us to mean, as the plaintiff contends, that the commission shall have the right and be entitled to take over and perform, or complete or contract for the performance or completion of the work embraced in such contract or any part of such work, then, the commission, with the approval of the board of estimate and apportionment, may, itself, undertake to perform or complete the work embraced in such contract, or any part of such work, as in its judgment the public interest requires; and in order to do this, the commission may em-

ploy such persons, or purchase and hire such plant, tools, machinery, supplies, and materials, as may be necessary.

[14] The statute does not, in our opinion, mean that, after the commission has, with the consent of the board of estimate and apportionment, itself taken over the performance of work under such a contract, whenever it finds it necessary in the course of the work to employ some person or to purchase or hire some tool or machinery, etc., no matter how trivial the amount involved, it must go to the board of estimate and apportionment and get its consent to employ the particular person or to purchase or hire the particular tool needed, as counsel for the defendant contend. We think that under the provisions of section 36 of the act, and section 37 of the act, as added by Laws 1894, c. 752, no further consent of the board of estimate and apportionment is necessary where, in the course of its work, undertaken with the approval of the board of estimate and apportionment, the commission finds it necessary to employ persons or purchase or hire tools, machinery, etc., when the amount involved is less than $25,000.

Then it is said that the relocation of the electric feed wires of the New Haven Company resulted in no benefit to the city of New York; and in making this claim it is said that the city should not be accused of attempting to evade its just obligations. We are not aware that any accusations of "evasion" have been made, and, if they had been, this court is not sitting to determine whether the charges are justified. The question, and the only one, which we have to decide, is whether in law the plaintiff is entitled to recover in this action the amount for which this suit was brought.

[15] We do not think it can be seriously contended that the city was not benefited by the services rendered in the performance of this work. The Public Service Commission admits that the relocation of the wires were necessary to permit the construction and operation of the Municipal Rapid Transit Railroad, which the commission was at the time engaged in building for the city, and for the cost of which relocation the commission had agreed that the city should pay. That the city was benefited by what was done is so apparent that it is unnecessary to say more concerning it. The work was done upon the urgent request of the city's agent, the Public Service Commission, and the benefits resulting from it the city accepted and retains.

Judgment affirmed.