Henry Clay Greenberg, J.
From 1949 to 1952, the Port of New York Authority (Authority) expended approximately $212,000 in relocating the gas mains, wires, cables and other facilities of Consolidated Edison Company of New York, Inc., and its subsidiary, Consolidated Telegraph and Electrical Subway Company (Consolidated), during the construction of the 179th Street Tunnel, a public highway approach to the George Washington Bridge. These payments were made by the Authority pursuant to stipulation without prejudice to a determination of ultimate liability. Both parties now move for summary judgment, agreeing that the disputed issues involve only questions of law.
The bridge itself, including the earlier approach tunnel, the 178th Street Tunnel, had been constructed by the Authority during the years 1927-1931. The Authority had assumed the payment of all expenses incurred in relocating the facilities of utility companies in the course of that construction as well as all other constructions up to 1946. Thereafter, in reliance on New York City Tunnel Auth. v. Consolidated Edison Co. (295 N. Y. 467 [1946]), it asserted its present position, that a utility company must, at its own expense, relocate its facilities when required by a construction undertaken by the Authority.
The “fundamental” common-law rule — that a utility company takes its franchise for the use of public streets subject to the risk that, whenever required by public convenience or necessity, it must remove and relocate its facilities at its own cost — was restated in Transit Comm. v. Long Is. R. R. Co. (253 N. Y. 345). That obligation is held to be an implied condition of the grant for which the utility has incurred no cost and pays no rental to the public. The common-law rule applies unless the Legislature expressly provides otherwise in the particular enabling statute. ‘ ‘ Buies of the common law are to be no further abrogated than the clear import of the language used in the statute absolutely requires.” (Transit Comm., supra, p. 355.) Similarly, in the later cases of Matter of Town of Cheektowaga Grade Crossings (259 App. Div. 141, affd. 283 N. Y. 687) and Western New York Water Co. v. Brandt (259 *47 App. Div. 11, appeal dismissed 283 N. Y. 686) the courts found no express direction in the enabling statutes relieving any affected utility company of its common-law obligation.
New York City Tunnel Auth. v. Consolidated Edison Co. (295 N. Y. 467, supra) decided a new phase of the problem when it determined that the construction of the Queens-Midtown Tunnel was a governmental, and not a proprietary function, notwithstanding the fact that the statute provided for the collection of tolls to cover the expenses thereof. Reversing the contrary holding of the Appellate Division, the Court of Appeals held that no legislative intent to relieve utility companies of 1 ‘ obligations to which they were subject by well-established rules ” could be spelled out from the mere circumstance of the “ Legislature’s choice of the incidence of this taxation” in creating “ a new class of taxpayers ” (p. 476). Pointing out that the Tunnel Authority was ‘‘ a body corporate and politic ’ ’, not a private corporation but ‘ ‘ an agent of the State ’ ’, directed by the Legislature to be regarded “ ‘ as performing an essential governmental function in the exercise of the powers conferred upon it by this title ’ ”, that the project of a public highway improvement was clearly “a public purpose ”, and that the enabling statute showed no express intent to abrogate the common-law rule, the court found these defendant utility companies liable for the cost of relocating their facilities.
The Port Authority, which had filed a brief amicus curice in the Court of Appeals in the Tunnel Authority case, relies upon that decision as a controlling precedent on all fours with the instant case.
Consolidated, maintaining the inapplicability of that decision, advances a number of arguments:
(1) That the New York City Tunnel Authority, an alter ego of the city, was constructing a local improvement for the benefit of the people of the city, so that it was not unreasonable to require municipal utility consumers, who presumably would be the prime users of the Queens-Midtown Tunnel, to bear the expenses of relocation rather than have such expenses charged to motorists using the tunnel; but that such requirement would be an unreasonable imposition in the case of a bi-State agency constructing an interstate artery for the benefit of New York State, New Jersey and the rest of the Nation. However, Tunnel Authority held that the Legislature’s choice of the incidence of taxation to cover the expenses of construction was immaterial in the absence of an express direction concerning relocation expenses, and decision there turned on the fact that the Authority as “an agent of the State ’ ’ was exercising a ‘ ‘ gov *48 ernmental function ’ ’ in constructing the tunnel. The statutes creating the Port Authority similarly and conclusively establish the governmental nature of the functions to be exercised in each State by the Authority as the joint agent of the States of New York and New Jersey. (L. 1921, ch. 154, as amd.) The condition for the invocation of the common-law rule as to relocation of utility facilities — “ public convenience or necessity ”— is fully met in this case.
(2) That the provisions of the George Washington Bridge enabling statutes establish that the Legislature intended that all costs of construction, including relocation expenses, be paid by the Authority out of the tolls collected. The statutes in question refer to the raising by means of the Authority’s obligations secured by the pledge of tolls “ of the money needed for the construction of the said bridge and incidental purposes ”, to the levying of such tolls as “to insure at least sufficient revenue to meet the expenses of the construction, operation and maintenance thereof ”, and to the policy that such bridge shall be “in all respects self-sustaining” (L. 1926, ch. 761, § 3). However, there is no reference to relocation expenses. When the Legislature wanted to change the common-law relocation rule, it did so in direct and unmistakable fashion; thus, in the Public Authorities Law (§ 359, subd. 3), it provided that the New York State Thruway Authority was to bear “ the expense of such relocation ”, referring specifically to “ telephone and telegraph wires, power transmission and gas, oil and water lines, conduits, cables or every kind and nature ”. A legislative intent to depart from a well-settled principle of law must be expressed in clear and unequivocal language. These statutes do not differ materially from the enabling statute construed in Tunnel Authority nor those involved in Delaware Riv. Joint Toll Bridge Comm. v. Colburn (310 U. S. 419); New Jersey Bell Tel. Co. v. Delaware Riv. Joint Comm. (125 N. J. L. 235); Delaware Riv. Port Auth. v. Pennsylvania Public Utilities Comm. (393 Pa. 639). But in these, as in all other cases on the subject, the absence of a specific statutory direction was held to be fatal to the utility’s .argument that the common-law relocation rule had been abrogated. When the Legislature, which is presumed to be .acquainted with the common law existing at the time, refers to the “ expenses of the construction ” and similar general phrases, it .cannot be deemed to have included therein the expense of relocating facilities which by the established law is to be borne by the utility affected.
(3) That nowhere in these enabling statutes is the Authority .granted the power to compel uncompensated relocations o* utility *49 facilities. This very argument, however, was rejected in both the Transit Commission and Tunnel Authority decisions. The reverse construction, it was pointed out, is to be given the law: That the common-law rule applies until the Legislature provides otherwise and that such power as a State agency is to be implied unless expressly negatived.
(4) That the fairness and reasonableness of Consolidated’s interpretation of these enabling statutes is supported by the Authority’s own statement of its position on August 8, 1930 at the time of the original construction and by its practice up to 1946 of making payment for all such relocation expenses. Actually, however, in the letter referred to as stating the Authority’s original position, it rejected the proposition advanced by certain utility companies that it was acting in a proprietary capacity, insisting that it was exercising a governmental function; but declaring that “as a matter of public policy ’ ’ it deemed it more appropriate to charge relocation costs against the users of the bridge rather than against the utility companies. Accordingly, until the Tunnel Authority decision, the Authority paid all relocation expenses, not as obligations required by law, but in its discretion as a matter of policy. Consolidated urges that the Authority’s conduct over the long span of time represents a practical construction of the statutes, which is entitled to great weight. But such a continued practice is not binding, so long as the other party ‘1 has not been led to act to its disadvantage in any regard ” and “ the position of the parties has not been altered”. (Brainard v. New York Cent. R. R. Co., 242 N. Y. 125, 133.) If no question of prejudice is involved, a party always has the right to change a mistaken or discretionary practice, especially after the courts have definitively declared the correct principle of law applicable thereto.
(5) Finally, that the Authority is obliged to pay for relocation expenses by virtue of the terms of an agreement dated July 29, 1930 with the City of New York. The basic George Washington Bridge statute provided that no property held by the City of New York should be taken by the Authority without its consent and that the plan of approach at its end should be subject to its approval. By the 1930 agreement with the city the Authority was granted permission to enter and occupy the streets adjacent to the proposed site upon stated covenants undertaken by the Authority, among which were the following: that it would relocate “ City-owned surface and subsurface facilities pay “to the City of New York ” the cost of all street improvements; assume the obligation of making at its *50 own expense all physical changes in the city streets including the relocation of “ water mains, pipes, sewers, firealarm boxes and other facilities, owned by the City and forming part of the City’s water, sewer, lighting and fire-alarm systems ”; “ assume responsibility for the protection of and against damage to all City structures affected by said work ” and “ will assume full responsibility for, and relieve the City of any liability for, the interference with or damage to any and all public utilities ”. The only reference in the entire agreement to utilities is this last-mentioned clause dealing, not with the cost of the relocation of their facilities, but solely with “ the interference with or damage to ” them which might be occasioned by the work. It is obvious that the agreement was made for the city’s own benefit. It is for its facilities only that the Authority expressly assumed the obligation of relocation at the Authority’s expense. The subject of interference with or damage to facilities was covered by a twofold provision for the city’s protection. The Authority assumed responsibility for damage to any city facilities. The Authority also assumed responsibility, and agreed to indemnify the city against liability, for damage to any utility facilities. This last provision simply meant that the utilities, as third-party beneficiaries for this limited purpose, could sue the Authority for negligent or unnecessary “ interference with or damage to ” their facilities (other than their mere removal or relocation), and that the Authority in addition agreed to indemnify the city against its common-law liability for such interference or damage caused by its permittee, the Authority (cf. Coley v. Cohen, 289 N. Y. 365). Certainly, this damage clause cannot be deemed to encompass the matter of relocation of utility facilities. In the absence of a specific reference thereto, the proper interpretation of the agreement, just as in the case of enabling statutes, must be that it was not intended to relieve utilities of an obligation to which they were subject by a well-settled principle of law.
The Authority’s motion is accordingly granted and Consolidated’s motion denied.