217 P.3d 424

QWEST CORPORATION, a Colorado corporation; Qwest Broadband Services, Inc., a Delaware corporation, Plaintiffs/Appellees,

v.

CITY OF CHANDLER, an Arizona municipal corporation, Defendant/Appellant.

No. 1 CA–CV 07–0852.

Court of Appeals of Arizona, Division 1, Department E.

Aug. 27, 2009.

Fennemore Craig PC By Andrew M. Federhar, Theresa Dwyer–Federhar, Scott J. Shelley, Phoenix, Attorneys for Plaintiffs/Appellees.

Chandler City Attorney's Office By James R. Cairns, III, Assistant City Attorney, Chandler, Attorney for Defendant/Appellant.

Andrew P. Thomas, Maricopa County Attorney By Stephen A. Wolf, Deputy County Attorney, Domingos R. Santos, Jr., Deputy County Attorney, Phoenix, Attorneys for Amicus Curiae Maricopa County.

Barbara LaWall, Pima County Attorney By Thomas A. Denker, Deputy County Attorney, Tucson, Attorneys for Amicus Curiae Pima County.

David R. Merkel, General Counsel, League of Arizona Cities and Towns, Tempe, Attorney for Amicus Curiae League of Arizona Cities and Towns.

## OPINION

KESSLER, Judge.

¶ 1 In this appeal, we consider whether a pre-statehood franchise for electric telegraph service under Chapter 53, § 1 of the Compiled Laws of Arizona (1877) (the "1877 Law") exempts Qwest Corporation and Qwest Broadband Services, Inc. (collectively "Qwest") from having to pay the costs of relocating its telephone and cable lines from a public right of way when those lines interfere with a public purpose. We hold the franchise does not exempt Qwest from paying the relocation costs. Accordingly, we reverse the superior court and direct it to enter judgment for the City of Chandler ("City").

## FACTUAL AND PROCEDURAL BACKGROUND

¶ 2 Qwest owns telephone and cable television lines within Site 7 in Chandler, an area bounded on the east and west by Colorado Street and Arizona Avenue and on the north and south by Chandler Boulevard and Buffalo Street. Qwest's telecommunications facilities lie above and below ground in a public right of way in Site 7.

¶ 3 In April 1984, the City adopted a resolution to designate a downtown redevelopment area and issued a request for proposal for development of Site 7. Approximately seventeen years later, the City hired a private developer for Site 7, and then acquired the Site 7 property. On April 6, 2004, the City informed Qwest that it would need to relocate its Site 7 facilities at its own expense.

¶ 4 While disputing the City's authority to require the company to pay for its relocation, Qwest proposed to proceed with the relocation without prejudice to mounting a reim-

bursement claim against the City. The City agreed and Qwest moved its Site 7 facilities. When the City subsequently rejected its written request for payment, Qwest filed a notice of claim pursuant to Arizona Revised Statutes ("A.R.S.") section 12–821.01 (2003).

¶ 5 Having received no response to its notice of claim, Qwest filed suit against the City in October 2005. Qwest's complaint asserts claims for inverse condemnation under the Arizona and United States Constitutions, as well as under 42 U.S.C. § 1983, and seeks declaratory relief and damages. It theorizes that, as a successor to telecommunications entities operating before Arizona became a state, Qwest holds a franchise under the 1877 Law to construct and maintain its facilities from point to point on public roadways in Arizona, and the City could not require Qwest to relocate its facilities from such locations without compensation. The 1877 Law provides:

> That any person or persons, association or company, may be, and they are hereby authorized to construct and maintain lines of electric telegraph, together with all necessary fixtures appurtenant thereto, from point to point, upon and along any of the public roads or highways, and across any of the waters or bridges within the limits of this Territory, or upon the land of any individual, the owners of the land through which said telegraphic lines may pass having first given their consent; *provided,* that the same shall not in any instance be so constructed as to incommode the public in the use of said roads or highways and bridges, or endanger or injuriously interrupt the navigation of said rivers.

¶ 6 The parties filed cross-motions for summary judgment on whether a public utility operating under a pre-statehood franchise is obligated to relocate facilities at its own expense. The superior court accepted Qwest's argument that the pre-statehood franchise granted it a property right and that it was not required to pay its own relocation costs. The superior court did not determine the amount of compensation due to Qwest.

¶ 7 The court certified its ruling as final under Arizona Rule of Civil Procedure 54(b) and entered judgment. This appeal followed.

## DISCUSSION

¶ 8 Summary judgment is appropriate "if the facts produced in support of the claim or defense have so little probative value, given the quantum of evidence required, that reasonable people could not agree with the conclusion advanced by the proponent of the claim or defense." *Orme Sch. v. Reeves,* 166 Ariz. 301, 309, 802 P.2d 1000, 1008 (1990). We independently review whether a genuine issue of material fact exists and whether the superior court correctly applied the substantive law. *Aaron v. Fromkin,* 196 Ariz. 224, 227, ¶ 10, 994 P.2d 1039, 1042 (App.2000) (citation omitted). In addition, we apply the *de novo* standard in reviewing questions of statutory interpretation. *Phelps Dodge Corp. v. Ariz. Dep't of Water Res.,* 211 Ariz. 146, 148, ¶ 9, 118 P.3d 1110, 1112 (App.2005) (citations omitted). In this case, the facts are not in dispute, the parties only disagreeing on the law.

**I. As a Matter of Law, the 1877 Law Does Not Overcome the Common–Law Rule Requiring Utilities to Pay to Remove or Relocate their Equipment.**

¶ 9 For the following reasons, we hold that the implied common-law duty of utilities to pay to relocate their property from a public way applies to Qwest's franchise. We also reject Qwest's arguments that the 1877 Law abrogated or preceded the common-law rule or that other Arizona statutes are inconsistent with the common-law rule.

**A. The Common–Law Rule.**

¶ 10 The Arizona Supreme Court has recognized that "[i]t is well settled that a public utility accepts franchise rights in public streets subject to an *implied* obligation to relocate its facilities therein *at its own expense* when necessary to make street improvements." *Paradise Valley Water Co. v. Hart,* 96 Ariz. 361, 364, 395 P.2d 716, 718 (1964) (emphasis added) (citations omitted).[1]

---

1. While the Arizona Supreme Court held in *Para-* *dise Valley Water* that the power to impose re-

In so holding the court relied upon *New Orleans Gaslight Co. v. Drainage Comm'n of New Orleans,* 197 U.S. 453, 25 S.Ct. 471, 49 L.Ed. 831 (1905), and other authorities for what it stated was "an exhaustive list of authorities supporting this proposition." 96 Ariz. at 364, 395 P.2d at 718. Our court has consistently agreed with this conclusion. *City of Bisbee v. Ariz. Water Co.,* 214 Ariz. 368, 378–79, ¶¶ 35–41, 153 P.3d 389, 399–400 (App.2007); *El Paso Natural Gas Co. v. State,* 135 Ariz. 482, 483, 662 P.2d 157, 158 (App.1983); *cf. Contempo Constr. Co. v. Mountain States Tel. & Tel. Co.,* 153 Ariz. 279, 283, 736 P.2d 13, 17 (App.1987) (acknowledging the rule that utilities have "a legal duty to move their own equipment and should bear their own costs," but holding that obligation does not extend to the contractor hired by the city).

¶ 11 In *New Orleans Gaslight,* the United States Supreme Court cited authorities supporting this common-law rule going back as far as 1876. 197 U.S. at 461–62, 25 S.Ct. 471. The Court applied this principle in *New Orleans Gaslight* to a franchise granted in 1835. *Id.* at 453, 25 S.Ct. 471. In that case, after granting a gas company an exclusive franchise to place pipes in the streets of New Orleans, the state created a drainage plan that required the relocation of some of the pipes. *Id.* at 453–54, 25 S.Ct. 471. Like Qwest, the gas company contended that it had a vested property right in maintaining the pipes and the city was required to cover the relocation expenses. *Id.* at 453, 25 S.Ct. 471. The Court disagreed and explained:

> The gas company did not acquire any specific location in the streets; it was content with the general right to use them; and when it located its pipes it was at the risk that they might be, at some future time, disturbed, when the state might require for a necessary public use that changes in location be made.... [W]hatever right the

gas company acquired was subject, in so far as the location of its pipes was concerned, to such future regulations as might be required in the interest of the public health and welfare.

*Id.* at 461, 25 S.Ct. 471. To put it another way, by accepting the franchise the utility impliedly agreed to bear the expense of any subsequent relocation of the distribution system ordered pursuant to the government's police power. *Nat'l City v. Cal. Water & Tel. Co.,* 204 Cal.App.2d 540, 22 Cal.Rptr. 560, 568 (1962). Thus, even though the gas company had the original franchise in *New Orleans Gaslight,* it was liable for its own relocation costs. *New Orleans Gaslight,* 197 U.S. at 460–62, 25 S.Ct. 471; *see generally Norfolk Redevelopment & Hous. Auth. v. Chesapeake & Potomac Tel. Co.,* 464 U.S. 30, 35, 104 S.Ct. 304, 78 L.Ed.2d 29 (1983) ("Under the traditional common-law rule, utilities have been required to bear the entire cost of relocating from a public right-of-way whenever requested to do so by state or local authorities.").

¶ 12 This common-law rule of implied duty to pay for relocating property is the general rule in the United States. 12 E. McQuillin, *The Law of Municipal Corporations* § 34:92, at 324–25 (3d ed.2006) [hereinafter "*McQuillin*"] ("[I]t is generally held that the municipality may require a change in the location of pipes or other underground facilities of the grantee of a franchise, where public convenience or security require it at the grantee's own expense....").[2] This implied power in particular applies to the relocation of electric utility poles and wires, including telegraph and telephone wires, as those wires "are erected with an implied understanding that if the public necessity require it they shall be changed ... as to make their use of the streets as slight an inconvenience to the public as possible." *Id.,* § 34:96 at 336. A mu-

strictions on the franchise for the public convenience was express in that case under the terms of the franchise, it also held such power was implied in the franchise by law. *Id.*

**2.** *McQuillin* cites twenty jurisdictions that support this general rule. 12 *McQuillin, id.* at 324–26, 330, 395 P.2d 716. This general rule is also supported by the language in *Paradise Valley*

*Water,* citing a different treatise and stating that "an exhaustive list of authorities support[s] this proposition." 96 Ariz. at 364, 395 P.2d at 718. *McQuillin* cites only one state which has rejected the common-law doctrine, Arkansas. 12 *McQuillin, id.,* § 34:92 at 326 (citing *Sw. Bell Tel. Co. v. City of Fayetteville,* 271 Ark. 630, 609 S.W.2d 914 (1980)).

nicipality has this police power even if the franchise was granted by the legislature. *Id.* at 336–37.

█ ¶ 13 This implied obligation of a utility to pay its own relocation costs exists because the right accorded to a utility company to use the public way is subject to regulation in the exercise of police power. *Bisbee,* 214 Ariz. at 379, ¶ 37, 153 P.3d at 400; *City of Macon v. S. Bell Tel. & Tel. Co.,* 89 Ga.App. 252, 79 S.E.2d 265, 274–75 (1953); 12 *McQuillin,* § 34:91 at 317. Other states have held that forcing utilities to relocate their equipment or property because of a municipality's redevelopment process is not a taking of property so as to require compensation. 12 *McQuillin, id.,* § 34:92 at 326–27 (collecting cases). Qwest does not claim that the redevelopment project here is not a public use.

¶ 14 A franchise's implied obligation applies unless a statute otherwise provides or the city expressly agrees to compensate the utility for the relocation. *S. Cal. Gas Co. v. City of L.A.,* 50 Cal.2d 713, 329 P.2d 289, 293 (1958) (holding that the utility has the obligation to pay relocation expenses absent an express direction from the legislature or a provision in the franchise abrogating this obligation); 12 *McQuillin, id.,* § 34:92 at 326–28.

¶ 15 Qwest argues on appeal, as it successfully argued in the superior court, that its pre-statehood franchise was not subject to this common-law principle because the 1877 Law [3] granted it an irrevocable contract to the locations where Qwest's predecessors placed their lines. According to Qwest, an irrevocable contract was created by the offer to its predecessor to use the "public roads and highways," which its predecessor accepted by constructing and maintaining its facilities. The superior court consequently concluded that Qwest was not obligated to pay the relocation costs under *City of Louisville*

*v. Cumberland Tel. & Tel. Co.,* 224 U.S. 649, 32 S.Ct. 572, 56 L.Ed. 934 (1912). We disagree.

¶ 16 *Cumberland* concerned the Louisville general council's attempt to *revoke* a telephone company franchise, rather than merely to require relocation of equipment under the police power. *Id.* at 659, 32 S.Ct. 572. The Kentucky Legislature had chartered the Ohio Valley Telephone Company in 1886, authorizing it to construct and maintain telephone lines, exchanges, and systems within the state and elsewhere. *Id.* at 650, 32 S.Ct. 572. The statute creating the franchise gave the council the power to consent to the franchise, which the general council did by passing an ordinance. *Id.* at 650–51, 32 S.Ct. 572.

¶ 17 The general council subsequently repealed the ordinance under which the company had erected poles, strung wires, and conducted the telephone system. *Id.* at 653, 32 S.Ct. 572. The United States Supreme Court found that the parties had perfected the franchise when the city consented, and the franchise could not be repealed because the ordinance made no provision for it. *Id.* at 653, 32 S.Ct. 572. Moreover, the Kentucky Constitution of 1891 protects previously granted charters from such action. *Id.* at 660, 32 S.Ct. 572. The Court reasoned that the telephone company would never have built its system if its franchise was revocable at the will of the city:

> These structures are permanent in their nature and require a large investment for their erection and construction. To say that the right to maintain these appliances was only a license, which could be revoked at will, would operate to nullify the charter itself, and thus defeat the state's purpose to secure a telephone system for public use. For, manifestly, no one would have been willing to incur the heavy expense of installing these necessary and costly fix-

---

**3.** The Arizona Territorial Legislature repealed the 1877 Law in 1887. *See* Revised Statutes of Arizona at 568 (1887). Qwest denies that its predecessors' franchise was likewise repealed. Rather, Qwest maintains that its predecessors' franchise was reaffirmed in Article 15, section 7, of the Arizona Constitution, which provides in pertinent part that "[e]very public service corpo-

ration organized or authorized under the laws of the State to do ... transmission business ... shall have the right to construct and operate lines connecting any point within the State...."

We assume without deciding that the above-quoted provision continued the earlier franchise. Thus, our analysis is based on the language of the 1877 Law.

tures if they were removable at [the] will of the city, and the utility and value of the entire plant be thereby destroyed.

*Id.* at 663-64, 32 S.Ct. 572. Seizing on this language, Qwest argues that it must be compensated for having to remove its facilities; otherwise, Qwest's predecessors would never have invested in the initial telegraph and telephone system.

¶ 18 Qwest's reliance upon *Cumberland* is misplaced. The City's request that Qwest move these lines at its own expense does not nullify a charter or franchise as occurred in *Cumberland.* The City is not asking Qwest to remove all of its facilities nor is it revoking Qwest's right to use the City's streets. Nothing in *Cumberland* supports a right for Qwest to keep its facilities at a specific location. *See, e.g., Consol. Edison Co. of N.Y. v. Lindsay,* 24 N.Y.2d 309, 300 N.Y.S.2d 321, 326, 248 N.E.2d 150 (1969) (holding that a utility company has no vested right in any particular street location for its facilities). Such rights arise only when the utility places its facilities in a location before the government acquires the right of way and establishes it as a public street. *Sanitary Dist. No. 1 of Pima County v. State ex rel. Willey,* 1 Ariz.App. 45, 50, 399 P.2d 179, 184 (1965). Qwest makes no such claim in this case. Thus, this case more closely resembles *New Orleans Gaslight,* which deals with relocation of facilities rather than revocation of a franchise.

█ ¶ 19 Our distinction between exercise of the police power to require a utility to relocate its equipment at its own expense for the public good and the revocation of a corporate charter is further supported by two United States Supreme Court decisions. In *New Orleans Pub. Serv., Inc. v. City of New Orleans,* 281 U.S. 682, 50 S.Ct. 449, 74 L.Ed. 1115 (1930), the Court upheld a city ordinance requiring a street railway to demolish a viaduct and construct grade crossings. The utility, like Qwest here, relied on cases, including *Cumberland,* to argue it had a contract with the city and the city's new ordi-

nance violated the constitutional prohibition of impairment of contract. The utility argued that cases which condemned cities' attempts to repeal a grant of a right to use a street for a railroad or required payment of additional fees not in the original contract to use a surface street for wires likewise applied to the viaduct ordinance. *Id.,* 281 U.S. at 685, 50 S.Ct. 449. The Court expressly rejected that argument and held *Cumberland* did not apply:

> Neither of these cases has any application here. The ordinance now under consideration does not aim to destroy or to exact payment for the right of appellant to use the street for the operation of its street railway. It purports merely to regulate the use of the streets for the convenience and safety of the public. It does not impair appellant's franchise.

281 U.S. at 685–86, 50 S.Ct. 449. Similarly, the Court rejected the railway's claim that the ordinance amounted to a taking of private property without compensation:

> It is elementary that enforcement of uncompensated obedience to a regulation passed in the legitimate exertion of the police power is not a taking of property without due process of law.

281 U.S. at 687, 50 S.Ct. 449.[4]

¶ 20 Similarly, the Court distinguished between revoking a franchise and merely regulating it in this context in its earlier decision relating to the New Orleans Gaslight Co., *New Orleans Gas–Light Co. v. La. Light & Heat Producing & Mfg. Co.,* 115 U.S. 650, 6 S.Ct. 252, 29 L.Ed. 516 (1885). In the 1885 case, the Court held that because the gaslight company had been granted an exclusive franchise, the legislature's later revocation of that monopoly power without compensation amounted to an unconstitutional impairment of contract. *Id.* at 658–60, 673, 6 S.Ct. 252 (citations omitted). In contrast, twenty years later in the 1905 New Orleans Gaslight Co. decision, the Court held, after citing to its 1885 decision, that as to the same franchise the city could

---

**4.** The Court noted, however, that the police power had to be exercised in a reasonable fashion and there was nothing in the record showing that the demolition of the viaduct for public conven-

ience and safety was unreasonable. 281 U.S. at 687, 50 S.Ct. 449. Qwest does not argue the requirement to relocate its property for the redevelopment project was unreasonable.

force the company to relocate its lines in the city without compensation and no claim for impairment of contract or taking of property without compensation could be had. Rather, the forced relocation was *"damnum absque injuria* [injury without wrongdoing]." *Id.* at 462. *Accord* 12 *McQuillin*, § 34:91 at 318–21 (distinguishing between use of police power to regulate franchise use of streets and depriving the grantee of its property or its essential rights and privileges under the franchise "clearly beyond the exercise of the police power.").

¶ 21 Nevertheless, Qwest maintains that 1905 *New Orleans Gaslight* decision and its progeny are inapplicable because: (1) the 1877 Law abrogates the common-law rule, (2) the 1877 Law predates the common-law rule, and/or (3) more recent Arizona statutes are inconsistent with the common-law rule. As explained below, we reject those arguments.[5]

## B. The 1877 Law Does Not Abrogate the Common–Law Rule.

¶ 22 As an amicus points out, by 1864, our Territorial Legislature had adopted the Howell Code which provided that the common law is "the rule of decision in all courts of this Territory[,]" unless the common law is "repugnant to, or inconsistent with, the constitution and laws of the United States, or the bill of rights or laws of this Territory." *Id.* Ch. 61, § 7 (1864). This rule not only predates the 1877 Law, but was also retained in the compiled laws of 1877. *Id.* Ch. 61, § 7 (3438). We have more recently affirmed that we will not presume that our Legislature has repudiated the common law "without a clear manifestation that such was its intent." *In re Thelen's Estate*, 9 Ariz.App. 157, 161, 450 P.2d 123, 127 (1969); *see also Pleak v. Entrada Prop. Owners' Ass'n*, 207 Ariz. 418, 422, ¶ 12, 87 P.3d 831, 835 (2004) (explaining that the legislature must "expressly or by necessary implication" act when abrogating the common law). There is nothing in the 1877 Law which appears to "expressly or by necessary implication" abrogate the common law.

¶ 23 This rule applying the common law has also been applied in cases analyzing the specific issue of liability for relocation costs. For example, a New York court applied the common-law rule to determine relocation cost liability because the "clear import" of the state statute did not expressly

---

5. Likewise, Qwest contends that the later-decided *Cumberland* has somehow superseded *New Orleans Gaslight*. Because these cases discuss distinctly different issues, one does not supersede the other. As the City points out, the original grant gave Qwest's predecessors the right to use a public right of way without first acquiring the property and restricted the scope of the local entities' authority over franchise operations. Affording a city the right to require payment of relocation costs does not emasculate or impair these rights.

   In any event, the United States Supreme Court reaffirmed the continuing viability of *New Orleans Gaslight* in *Grand Trunk W. Ry. Co. v. City of S. Bend*, 227 U.S. 544[, 33 S.Ct. 303, 57 L.Ed. 633] (1913). There, the railroad received a franchise and was in the process of installing tracks when the city repealed its right to construct a double line of tracks. *Id.* at 545–46[, 33 S.Ct. 303]. The repeal of the company's franchise after work had begun constituted an unconstitutional impairment of the obligation of the contract. *Id.* at 556[, 33 S.Ct. 303]. Relying on *New Orleans Gaslight*, the Court explained that "the franchise, and not the particular location, being the essence of the contract, the city, under the power to regulate, might compel the company to [move the tracks' location within] the street."

*Id.* at 553[, 33 S.Ct. 303] (citing *New Orleans Gaslight*, 197 U.S. 453[, 25 S.Ct. 471, 49 L.Ed. 831]).

   Equally unavailing is Qwest's reliance on *City of Owensboro v. Cumberland Tel. & Tel. Co.*, 230 U.S. 58[, 33 S.Ct. 988, 57 L.Ed. 1389] (1913). The United States Supreme Court decided *Owensboro* after *Grand Trunk* and again acknowledged the city's "reservation of the police control of the streets, and of the mode and manner of placing and maintaining the poles and wires, incident to [its] unabridgeable police power." *Owensboro*, 230 U.S. at 72[, 33 S.Ct. 988].

   Nor are we persuaded by *Pinellas County v. Gen. Tel. Co.*, 229 So.2d 9 (Fla.Dist.Ct.App.1969). *Pinellas County* does not involve a pre-statehood franchise, cites no cases, and directly contradicts the Florida Supreme Court's decision in *S. Bell Tel. & Tel. Co. v. State ex rel. Ervin*, 75 So.2d 796 (Fla.1954). We find no Florida opinions relying on *Pinellas County*, and conclude that it is aberrational. *See Century Constr. Corp. v. Cent. Tel. Co.*, 370 So.2d 825 (Fla.Dist.Ct.App.1979); *Oriole Homes Corp. v. Bellsouth Telecomms., Inc.*, 641 So.2d 504 (Fla.Dist.Ct.App.1994). Finally, we decline to discuss an unpublished decision cited by Qwest as it has no precedential value. *See* Arizona Rules of Civil Appellate Procedure 28(c); *Walden Books Co. v. Dep't of Revenue*, 198 Ariz. 584, 589, 12 P.3d 809, 814 (App.2000).

provide otherwise. *Port of N.Y. Auth. v. Consol. Edison Co. of N.Y.*, 27 Misc.2d 45, 205 N.Y.S.2d 781, 783 (1960); *see also Cent. Me. Power Co. v. Waterville Urban Renewal Auth.*, 281 A.2d 233, 235–36 (Me.1971) (a municipality cannot pay a utility for relocation expense without express authority from the legislature). Similarly, both the Washington Supreme Court and the Oregon Court of Appeals have held that where the franchise document did not provide who would pay for relocation of the company's property under the police power, the utility had to pay the relocation costs. *Wash. Natural Gas Co. v. City of Seattle*, 60 Wash.2d 183, 373 P.2d 133, 134–35 (1962); *Urban Renewal Agency of City of Eugene v. Pac. Nw. Bell Tel. Co.*, 23 Or.App. 384, 542 P.2d 908 (1975). As the court in *Wash. Natural Gas* forcefully put it:

> The great weight of authority supports the following rule:
>
> In the absence of an express and definite provision to the contrary, a utility company maintains its structures and rights in a public street subject to the paramount right of the city to use its streets for all proper governmental purposes. A grant, franchise, easement or other right ... is at all times subject to the police power of the sovereign, and *unless expressly agreed otherwise in the franchise, the company must, at its own expense, make such changes as the public convenience and necessity require ... if the franchise is silent as to payment of the cost of relocation of utilities, made necessary by public improvements, the cost must be borne by the franchise holder.*

373 P.2d at 135 (emphasis supplied) (citations and quotation marks omitted). *Accord, Port of N.Y. Auth.*, 205 N.Y.S.2d at 783.

¶ 24 We find no clear manifestation of intent to abrogate the common law in the 1877 Law. Nowhere in the statute is there an express reference to relocation or the liability for costs.

¶ 25 Qwest, however, contends that the provision in the 1877 Law that the utility may "maintain" lines from "point to point" abrogates the common law and means that the utility has a vested right to keep its facilities in their original locations or avoid

bearing relocation costs caused by municipal renovations. We disagree.

¶ 26 Even when a franchise identifies a specific piece of property for the utility's equipment and structure, it does not make the common-law rule inapplicable. One of the cases cited in *New Orleans Gaslight* is *Nat'l Water–Works Co. of N.Y. v. City of Kan.*, 28 F. 921 (6th Cir.1886). In that case, in 1873 the city passed an ordinance authorizing it to designate the specific streets where water pipes could be laid. Ten years later, the utility laid a water pipe on a specific street at the direction of the city. One year later, the city dug a sewer on that street and the utility had to move its pipe to another place. 28 F. at 921–22. The utility argued that because it laid the pipe where the city directed, it acquired a vested property right in that undisturbed location. The city argued that the utility took its contract right to lay pipes subject to the city's police powers. *Id.* at 922–23. The court agreed with the city, holding that the contract must be interpreted in the light of the well-established rule that the utility took its right to lay its pipes in the city streets subject to the paramount and inalienable right of the city to construct sewers therein whenever and wherever and thus the utility had no cause of action if it was compelled to move the pipes. *Id.* at 923. If the common-law rule applied to a franchise in that case that granted the utility the use of a specific street, the same rule applies to the less specific "point-to-point" language of the 1877 Law is also subject to the common-law rule.

¶ 27 Qwest also contends that the term in the 1877 Law that the utility not "incommode" the public's use of the roads only applied to the original installation and does not require Qwest to pay relocation costs if its lines become inconvenient for a later public construction project. We reject this argument for two reasons. First, other courts, including the United States Supreme Court, have held that a franchise prohibiting a utility from "incommoding" the public's use of roads required the utility to pay for moving its equipment when a public entity modified the roadway or location of the equipment. Thus, in *People ex rel. N.Y. Elec.*

*Lines Co. v. Squire,* 145 U.S. 175, 12 S.Ct. 880, 36 L.Ed. 666 (1892), the Court interpreted New York's general telegraph act of 1848, which included the proviso that the electric lines " 'shall not be so constructed as to incommode the public use of said roads or highways, or injuriously interrupt the navigation of said waters.' " *Id.* at 188, 12 S.Ct. 880. The Court held this act did not confer any unqualified right "upon any electrical company to construct its lines wherever or in whatever manner it might choose." *Id.* To the contrary, "the power is reserved to regulate the use by the electrical companies of all the public highways of the state...." *Id.* at 189, 12 S.Ct. 880. Other courts have similarly interpreted the statutory word "incommode" in this context. *Wash. Natural Gas Co.,* 373 P.2d at 135–36; *City of Seattle v. W. Union Tel. Co.,* 21 Wash.2d 838, 153 P.2d 859, 868–69 (1944); *City of Edmonds v. Gen. Tel. Co.,* 21 Wash.App. 218, 584 P.2d 458, 463 (1978); *City of Auburn v. Qwest Corp.,* 260 F.3d 1160, 1167–68 (9th Cir.2001), *overruled on other grounds by Sprint Tel. PCS, L.P. v. County of S.D.,* 543 F.3d 571 (9th Cir.2008) (applying Washington law and holding that use of term "incommode" in franchise required utility to pay to relocate equipment when the public's need for the land had changed). Indeed, the Washington law applied in the above cases was almost identical to the 1877 Law, providing that:

> Any telegraph or telephone corporation or company, or the lessees thereof, doing business in this state, shall have the right

to construct and maintain all necessary lines of telegraph or telephone for public traffic along and upon any public road, street or highway, along or across the right-of-way of any railroad corporation, and may erect poles, posts, piers or abutments for supporting the insulators, wires and any other necessary fixture of their lines, in such manner and at such points as not to incommode the public use of the railroad or highway, or interrupt the navigation of the waters.

*City of Seattle,* 153 P.2d at 864 (quoting from Rem.Rev.Stat. § 11352).[6]

█ ¶ 28 Similarly, franchises subject to limitations not to inconvenience the public have been interpreted to require the utility to pay to move its equipment when the public entity later needs to change or modify the roadway or location on which the equipment was placed. *Urban Renewal Agency,* 542 P.2d at 910–12. As the court in *Urban Renewal Agency* explained, "if the terms of the franchise are doubtful, they are to be construed strictly against the grantee and liberally in favor of the public. What is not unequivocally granted is withheld, and nothing passes by implication, except what is necessary to carry into effect the obvious intent of the grant." *Id.* (quoting *Rose City Transit v. City of Portland,* 18 Or.App. 369, 525 P.2d 1325, 1332 (1974), *modified on other grounds,* 271 Or. 588, 533 P.2d 339 (1975)). Applying this rule, the court held that the city could require the utility to relocate its poles without receiving compensation. *Id.*

---

6. *See also Ganz v. Ohio Postal Tel. Cable Co.,* 140 F. 692, 695 (6th Cir.1905). In *Ganz,* the statute provided that "such lines shall be so maintained as not to 'interfere with the ordinary travel on such [military or post] roads.' " *Id.* (citing Rev. Stat. § 5263) (internal quotations omitted). Although the telegraph company operated under the authority of the federal Post Roads Act, county commissioners ordered it to relocate its facilities so that a paved road could be expanded. *Id.* at 694–95. The Sixth Circuit held that a utility's obligation not to incommode the public's use of the streets under the Post Roads Act, codified at Rev. Stat. § 5263 (1901), applied any time during the franchise that the public is incommoded, not just at the outset of the franchise. *Id.* at 695. The Post Roads provision was enacted in 1866. *City of Auburn,* 260 F.3d at 1167.

Qwest argues that amicus Maricopa County is not entitled to discuss the Old Post Roads Act

analogy because the City did not raise it in the superior court. Amici are not allowed to raise new issues and their briefs may not "create, extend, or enlarge issues beyond those ... argued by the parties." *Ruiz v. Hull,* 191 Ariz. 441, 446, 957 P.2d 984, 989 (1998). Here, however, we do not understand Maricopa County to raise a new issue; it simply offers support for the City's position on appeal. In any event, the waiver rule is procedural, not jurisdictional. *Town of S. Tucson v. Pima County Bd. of Supervisors,* 52 Ariz. 575, 582, 84 P.2d 581, 584 (1938), and when we have to construe or apply statutes, we are not limited to the arguments of the parties if that would cause us to reach an incorrect result. *Yarbrough v. Montoya–Paez,* 214 Ariz. 1, 8 n. 6 ¶ 23, 147 P.3d 755, 762 n. 6 (App.2006) (*quoting Evenstad v. State,* 178 Ariz. 578, 582, 875 P.2d 811, 815 (App.1993)). Accordingly, we will consider *Ganz.*

¶ 29 Second, "incommode" is defined as "[t]o subject to inconvenience or discomfort; to trouble, annoy, molest, embarrass, inconvenience" and "[t]o affect with inconvenience; to hinder, impede, obstruct (an action, etc.)." 1, The Compact Edition of the Oxford English Dictionary at 1404 (1971). Nothing limits that definition to inconvenience caused only by a utility's initial act rather than inconvenience resulting from later, changed circumstances, such as a redevelopment project. It is irrelevant whether the inconvenience be at the time of the initial use or because of later modification or use of the land by the public. See supra ¶ 27.

¶ 30 We find further support for the City's position in the fact that when the Arizona Legislature wants to compensate utilities for their relocation costs, it has done so in unmistakable terms. For example, in 2004, the legislature enacted A.R.S. § 48–5107(A), which provides in relevant part: "All costs for the relocation, and reasonable ongoing costs related to the relocation, of utility facilities incurred after July 1, 2003 as a direct result of the construction and operation of a light rail project shall be reimbursed by the light rail project to the utility." Titled "Utility relocation reimbursement; definition," the statute applies to telephone line or telegraph line corporations and persons engaged in the generation, transmission, or delivery of telephone, telegraph, or cable television service. A.R.S. § 48–5107(D) (2004). No such language applies in this case.

¶ 31 Qwest has emphasized the investment its predecessors made in installing the telephone system, and has argued that holding utilities liable for later relocation costs will somehow discourage others from installing fixtures in the future. Yet our precedents are replete with examples of franchisees who have installed lines notwithstanding legal authorities requiring them to shoulder relocation costs. Qwest complains of the burden the costs will impose on its customers, but fails to address the fact that if it prevails, that burden will fall upon residents of the City. We therefore are not persuaded that public policy favors deviating from the common-law rule.

## C. The 1877 Law Does Not Predate the Common–Law Rule.

¶ 32 Qwest further argues that the 1877 Law predates the common-law rule. It contends the common-law rule requiring the utility to pay relocation expenses consequently cannot apply to Qwest's franchise here. We disagree.

¶ 33 As we have explained, the principle that a utility's location of its facilities on public roads is subject to the public interest dates back at least to the Post Roads Act of 1866. See City of Auburn, 260 F.3d at 1167 (tracing a Washington territorial statute of 1866 to the Post Roads Act, U.S. Rev. Stats. § 5263 (1866)). The Post Roads Act took effect eleven years before the enactment of the 1877 Law.

¶ 34 Moreover, much of the argument about requiring utilities to pay to remove their equipment under the police power arises from cases dealing with the impairment of contracts clause, art. I, § 10, of the United States Constitution. E.g., New Orleans Gaslight Co., 197 U.S. at 460, 25 S.Ct. 471. However, as early as 1810, the United States Supreme Court held that statutes, charters or rules reserving rights to alter franchises become part of the franchises so that the franchises are subject to such reservations and the franchise contracts are not constitutionally impaired. 5 McQuillin, § 19:81 at 980–81 (collecting cases). Indeed, this principle appears to go back to at least 1871, if not 1810. Pa. College Cases, 80 U.S. 190, 213, 20 L.Ed. 550 (1871); Miller v. State of N.Y., 82 U.S. 478, 488, 21 L.Ed. 98 (1872). The only limitations are that any alteration or amendment of the franchise may not defeat or substantially impair the object of the franchise, and that the alteration or amendment must be reasonable, made in good faith, and consistent with the scope and object of the franchise. 5 McQuillin, § 19:81 at 980–81 (citing cases). Qwest does not argue these exceptions to the rule. This rule is the precedent for the current rule that all contracts incorporate applicable statutes and common-law principles. Banner Health v. Med. Sav. Ins. Co., 216 Ariz. 146, 150, ¶ 15, 163 P.3d 1096, 1100 (App.2007) (citations omitted) (relevant statutes implicitly incorpo-

rated into contracts); *Beehive Med. Elec., Inc. v. Indus. Comm'n,* 583 P.2d 53, 60 (Utah 1978) (common law incorporated into contracts) (quotations and citations omitted); *cf. Johnson v. Hispanic Broadcasters of Tucson, Inc.,* 196 Ariz. 597, 599, ¶ 4, 2 P.3d 687, 689 (App.2000) (passage of legislation changes test to determine enforceability of contract from whether it is enforceable at common law to whether it complies with the statute).

¶ 35 *In re Deering* further confirms that the common-law rule applied at the time of the 1877 Law. 93 N.Y. 361 (1883). In that case, the court found that although gas companies were authorized under an 1848 law to lay their pipes in a city street, they assumed the risk of the pipes' location and could be required to relocate them at their own expense as public convenience or security might require. *Id.* at 362. Therefore, the court recognized the utility's obligation to pay under a statute that predates the 1877 Law. *See id.; accord Squire,* 145 U.S. at 188–89, 12 S.Ct. 880.

¶ 36 Accordingly, the common-law rule allotting relocation costs dates back at least to 1866, and the principle that a reservation of the right to later restrict the franchise does not impair the contract dates back to at least 1871, if not 1810. Because a franchise incorporates existing common law, and we assume that the Legislature is aware of the common law, we hold that the statute must be read in light of that common law.

¶ 37 In a related argument, Qwest asserts that an irrevocable contract with the City was formed once its predecessors accepted the grant to use streets for the construction and maintenance of facilities. We disagree. " 'It has long been the rule in Arizona that a valid statute is automatically part of any contract affected by it, even if the statute is not specifically mentioned in the contract.' " *Banner Health,* 216 Ariz. at 150, ¶ 15, 163 P.3d at 1100. Therefore, valid applicable laws existing at the time of the contract form a part of the contract as fully as if they were expressly incorporated in the contract. Thus, contractual language must be interpreted in light of existing law, the provisions of which are regarded as implied terms of the contract, regardless of whether the agreement refers to the governing law. 11 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 30:19, at 203–04 (4th ed.1999) (footnotes omitted). This principal may also apply to the common law of the jurisdiction and "constitutional provisions, statutes, ordinances, and regulations, including provisions which affect the validity, construction, operation, effect, obligations, performance, termination, discharge, and enforcement of the contract." *Id.* at § 30:19 at 211–14 (footnotes omitted); *Beehive Med. Elec.,* 583 P.2d at 60. Consequently, because we find the common law is incorporated into Qwest's franchise, Qwest is liable for relocation costs.

### D. Subsequent Enactments are Consistent with the Common–Law Rule.

¶ 38 Qwest also alleges that subsequent legislative enactments make clear that the common-law rule does not apply to franchises under the 1877 Law. Chapter 90, § 50(a), Laws of the 1st Regular Session (1912) provides that no telephone corporation shall begin construction of a line, system, or plant without first obtaining a commission certificate, "provided that this section shall not be construed to require any such corporation to secure such certificate for an extension within any city, county or town within which it shall have theretofore lawfully commenced operations." Similarly, A.R.S. § 9–582(E) (2008) states that any telecommunications corporation providing service within this state on November 1, 1997 pursuant to a grant made prior to the Arizona Constitution's effective date may continue to provide service under that grant until repealed, revoked, or amended, and will not be required to obtain an additional grant from a political subdivision. Likewise, Qwest points out that § 46–6.2(A) of the Chandler Municipal Code exempts telecommunications companies with pre-statehood grants, until repealed, revoked, or amended, from obtaining further authorization from the City to provide service.

¶ 39 These provisions do not advance Qwest's arguments because Qwest does not contend the City made any demand on it to

obtain an additional franchise or certificate. The provisions are irrelevant to whether Qwest is liable for its relocation expenses.

¶ 40 Another statute, A.R.S. § 40–283 (2001), provides more pertinent guidance by specifying that the public is entitled to exercise continuing control over the use and occupancy of the streets.[7] This provision supports the City's arguments. Although the Chandler Municipal Code does not determine our construction of a state statute, we note that other City Code provisions undercut Qwest's interpretation of Code § 46–2.6. *See* Chandler City Code § 46–2.6 (requiring a person to obtain a telecommunications encroachment permit); § 46–2.6(F)(any encroachment including cable, wire, and other structures or facilities "shall be relocated, at the sole expense of the permittee, as may be necessary to facilitate a public purpose or any City project").

## II. Cities Have Authority to Regulate Qwest's Use of its Franchise in their Public Roads and Streets.

¶ 41 Qwest alternatively argues that even if the common law does apply, only the State of Arizona, not a subordinate political subdivision such as the City may enforce that law.

■ ¶ 42 We disagree with Qwest in the context of this case. The Arizona Constitution permits the State to authorize cities to supervise utilities operating within city limits. *See* Ariz. Const., art. 15, § 3 ("incorporated cities ... may be authorized by law to exercise supervision over public service corporations doing business therein") and Ariz. Const., art. 15, § 15 ("[n]o public service corporation in existence at the time of the admission of this State into the union shall have the benefit of any further legislation except on condition of complete acceptance of all provisions of this Constitution applicable to public service corporations."). As the California Supreme Court explained, the City acts on behalf of the public good as an agent of the State:

> The company contends, however, that any implied obligations in its county franchise to relocate its pipes cannot be invoked for the benefit of the city operating outside its territorial limits. We cannot agree with this contention. Such obligations rest upon the paramount right of the people as a whole to use the public streets wherever located, and the fact that a franchise is granted by one political subdivision as an agent of the state ... does not defeat the right of another such agent acting in its governmental capacity to invoke the public right for the public benefit.

*S. Cal. Gas*, 329 P.2d at 291 (citations omitted).

¶ 43 Arizona's statutory scheme further undercuts Qwest's argument that only the State may enforce the franchise and regulate the streets and roads. In A.R.S. § 40–283(A), for example, the Arizona Legislature provides that the use and occupancy of the streets by any person engaged in the transmission business is "subject to control and regulation by the municipal authorities." This legislation specifically targets utilities like Qwest.

¶ 44 The Arizona Legislature has also delegated considerable management authority over roads and streets to the counties. Counties have the power to "[l]ay out, maintain, control and manage public roads." A.R.S. § 11–251(4) (Supp.2008). The counties' authority extends to acquiring the right of way for county roads, and establishing, altering and vacating those roads. A.R.S. § 28–6701(A), (B) (2004). It also includes maintaining public streets and roads outside of an incorporated town or city, A.R.S. § 28–6705 (Supp.2008), as well as controlling the streets of unincorporated towns. A.R.S. § 28–6708 (2004).

---

7. Section 40–283 provides:
   (A) Any person engaged in transportation or transmission business within the state may construct and operate lines connecting any points within the state and connect at the state boundary with like lines, except that within the confines of municipal corporations the use and occupancy of streets shall be under rights acquired by franchises ... and subject to control and regulation by the municipal authorities. The use of highways, except state highways, by public utilities not within any incorporated city or town shall be regulated by the board of supervisors of the county by license or franchise.

## III. The City Did not Engage in a Taking by Requiring Qwest to Pay its Own Relocation Costs.

■ ¶ 45 Finally, Qwest contends that requiring it to relocate its facilities without paying compensation is a taking under the due process clause of the Fifth and Fourteenth Amendments.[8] A taking occurs when an entity with the power of eminent domain substantially deprives an owner of the use and enjoyment of its property or physically invades it. *Lucas v. S.C. Coastal Council,* 505 U.S. 1003, 1018–19, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992).

■ ¶ 46 In *New Orleans Gaslight,* the United States Supreme Court expressly rejected a taking claim when the reasonable exercise of municipal power required a utility to relocate its facilities. 197 U.S. at 462, 25 S.Ct. 471. The Court explained:

> The gas company, by its grant from the city, acquired no exclusive right to the location of its pipes in the streets, as chosen by it, under a general grant of authority to use the streets. The city made no contract that the gas company should not be disturbed in the location chosen. In the exercise of the police power of the state, for a purpose highly necessary in the promotion of the public health, it has become necessary to change the location of the pipes of the gas company so as to accommodate them to the new public work. In complying with this requirement at its own expense, none of the property of the gas company has been taken, and the injury sustained is *damnum absque injuria* [damage without the invasion of legal right].

*Id. Accord, New Orleans Pub. Serv. Inc.,* 281 U.S. at 687, 50 S.Ct. 449. Even though a utility may have a property interest in a state franchise or its facilities, the utility cannot shield itself from relocation expenses by raising a taking claim so long as the municipal action is reasonable. *See First Nat'l Bank of Boston v. Me. Turnpike Auth.,* 153 Me. 131, 136 A.2d 699, 711–12 (1957) (finding no taking because the gas company acquired no exclusive right to the location of its pipes by virtue of the city's grant); *City of Macon,* 79 S.E.2d at 275–76 (requiring a telephone and telegraph company to remove its cables and conduits to another city location, without compensation, did not amount to a taking); *see generally* 4A Julius L. Sackman, *Nichols on Eminent Domain* § 15.04[2], at 15–29 (3d ed.1997) ("the attitude taken by most courts [is that] when public use requires the removal of utilities[,] ... such use is a privilege and no compensation is due the utility company that must move its facilities. Thus, required relocation of a utility cannot form a basis for inverse condemnation.") *cited in U.S. W. Commc'n, Inc. v. City of Longmont,* 948 P.2d 509, 523 (Colo.1997).

■ ¶ 47 We similarly conclude that Qwest has not suffered a taking. Nor has its contract through the 1877 Law been impaired in the constitutional sense. Qwest continues to enjoy its franchise right to operate in the City and had no permanent right to any given location for its facilities. No compensation is due.

## CONCLUSION

¶ 48 This court reviews a summary judgment to determine "whether a genuine issue of material fact exists and whether the trial court correctly applied the law." *PNL Asset Mgmt. Co., LLC v. Brendgen & Taylor P'ship,* 193 Ariz. 126, 129, ¶ 10, 970 P.2d 958, 961 (App.1998). When cross-motions for summary judgment have been filed, this court may evaluate the cross-motions and, if appropriate, remand with instructions that judgment be entered in favor or the appellants. *Id.; Burke v. Voicestream Wireless Corp. II,* 207 Ariz. 393, 400, ¶ 37, 87 P.3d 81, 88 (App.2004).

---

8. The Fifth Amendment to the United States Constitution provides in relevant part: "[N]or shall private property be taken for public use, without just compensation." The Fourteenth Amendment's due process clause applies the taking clause to the states. *See Penn Cent. Transp. Co. v. City of N.Y.,* 438 U.S. 104, 122, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). Article 2, Section 17 of the Arizona Constitution provides in pertinent part: "No private property shall be taken or damaged for public or private use without just compensation having first been made....".

¶ 49 Accordingly, we reverse the superior court's grant of summary judgment to Qwest, direct entry of summary judgment for the City, and remand for further proceedings consistent with this opinion.

CONCURRING: PATRICIA K. NORRIS, Presiding Judge and JOHN C. GEMMILL, Judge.